IN THE MATTER OF JERRY WAYNE VINSON

No. 30

(Filed 4 December 1979)

**1. Infants § 15— juvenile delinquent—photographing and fingerprinting prohibited**

The intent of the legislature in enacting G.S. 15A-502 was to prohibit the fingerprinting and photographing of any delinquent child, as defined by G.S. 7A-278(2), except in those limited cases where the child had been transferred to the superior court pursuant to G.S. 7A-280.

**2. Infants § 18— juvenile delinquency proceeding—photographs of juvenile— other basis for identification testimony—admissibility**

Where the Greensboro Police Department improperly photographed the 13 year old respondent, it would have been error for the trial court to allow admission of any testimony resulting from this illegal procedure into evidence at hearing; however, the trial court did not err in failing to suppress identification testimony based on the witness's prior knowledge of respondent and not on the basis of the illegal photographs, and evidence was sufficient to support the court's finding as to the basis of the identification testimony.

**3. Infants § 18— juvenile delinquency proceeding—sufficiency of evidence—applicable rules**

A juvenile respondent is entitled to the application of the same rules in weighing the evidence against him on a motion for nonsuit or to dismiss as if he were an adult criminal defendant.

**4. Infants § 18— juvenile charged with armed robbery—insufficiency of evidence**

In a juvenile delinquency proceeding where the juvenile was charged with armed robbery, the evidence raised no more than a suspicion or conjecture as to the identity of respondent as the perpetrator, since expressions by the only eyewitness to the crime indicated serious doubt, and the trial court therefore erred in denying respondent's motions for nonsuit.

**5. Infants § 18— juvenile delinquency proceeding—quantum of proof required**

The quantum of proof required in a juvenile case is proof beyond a reasonable doubt.

**6. Infants § 20— juvenile delinquency proceeding—dispositional hearing—no postponement to receive further evidence**

In a juvenile case where respondent is accused of a serious crime, and particularly when the juvenile requests it, the better practice is for the trial court to postpone the dispositional hearing until all available information is at hand; however, while the trial court's speedy denial of respondent's request for a psychological report in this case may not have been the better practice under G.S. 7A-285, it was not so irregular as to be improper.

**7. Infants § 20— juvenile delinquency proceeding—dispositional hearing—consideration of unadjudicated acts**

   Under present law with respect to juvenile delinquents and the new Juvenile Code, effective 1 January 1980, trial courts giving consideration at a dispositional hearing to unadjudicated acts allegedly committed by a juvenile, unrelated to that for which he stands petitioned, must first determine that such information is reliable and that it was competently obtained.

**8. Infants § 20— juvenile delinquency proceeding—final commitment order—alternative methods of rehabilitation—showing required**

   While the final commitment order in a juvenile proceeding need not formally state all the alternatives considered by a trial judge in committing a child, a finding that alternatives are inappropriate must be supported by some showing in the record that the sentencing authority at least heard or considered evidence as to what those alternative methods of rehabilitating were; the evidence in this case was insufficient to support the trial court's finding that the four enumerated factors in G.S. 7A-286(5) had been met.

   Justice BROCK took no part in the consideration or decision of this case.

   Chief Justice BRANCH concurring in result.

   Justices COPELAND and EXUM join in the concurring opinion.

ON appeal as a matter of right pursuant to G.S. 7A-30(2) from a decision of the North Carolina Court of Appeals finding no prejudicial error in the proceedings before *Pfaff, Judge,* Juvenile Session, District Court, GUILFORD County on 5 July 1978. Court of Appeals' decision, one judge dissenting, is printed at 40 N.C. App. 423, 252 S.E. 2d 854 (1979).

A juvenile petition was filed on 7 June 1978, alleging that the child was delinquent as defined by G.S. 7A-278(2) in that he committed armed robbery, a violation of G.S. 14-87, on 8 May 1978. The child at that time was a 13-year-old male.

While the child was tried only for the allegation noted above, and appeals from the finding of delinquency therein, it is apparent from the record before us that the child was alleged to have committed several serious delinquent acts during early May, 1978, and that he had a long record of juvenile delinquency. For a full understanding of this decision, it is necessary to summarize the entire record before us.

The record discloses that several motions were filed on behalf of the child prior to 7 June 1978, the date this petition was filed. On 26 May 1978, counsel for the child filed a motion for a

lineup alleging that a petition had been filed against the child on 11 May 1978 alleging the child to be delinquent for committing the crime of robbery on 10 May 1978. The motion was filed by Wallace C. Harrelson, Public Defender of the Eighteenth Judicial District. The motion alleged that counsel had been "led to believe" soon after his appointment that the child was "probably" not guilty of any delinquent act but that another individual was "probably" responsible for the charge against this child. Further, that counsel then contacted Judy W. Allen, a detective with the Greensboro Police Department, advised her of his concern and requested her to further investigate the case. It was, the child's counsel alleges, at that time agreed between Detective Allen, an assistant district attorney, and counsel for the child that a lineup would be conducted on 16 May 1978 in which the child would participate. However, subsequent to that conversation and prior to 15 May 1978 (and unknown to the child or his counsel) Detective Allen took photographs of the respondent and others and showed the photographs to the alleged victim of that crime, Genelia Breedlove. Upon contacting Detective Allen on 15 May 1978, counsel was advised that no lineup would be held since the detective had shown the victim photographs of the child and that he had been identified by the victim. The motion then prayed that an order be issued requiring the State to conduct identification procedures as provided by G.S. 15A-281.

On 6 June 1978, counsel for the child filed another motion and this time alleged that the child had been charged with the following deliquent acts: (1) larceny on 2 May 1978, (2) armed robbery (the present charge) on 8 May 1978 and, in the same petition, crime against nature on 10 May 1978, and (3) larceny on 3 May 1978 and the taking of personal property on 2 May 1978. It was then alleged that all of the petitions noted above were contained in the same file in the office of the Clerk of Superior Court of Guilford County and that such filing of allegations had previously been held to be unconstitutional.

On 7 June 1978, Judge Gentry entered an order finding that the child was charged with various petitions noted above and that they were kept in the same file bearing the heading of "Juvenile Petition or Motion for Review." The trial court entered findings of fact and conclusions of law and ordered, *inter alia*, that (1) the petitions against the child be dismissed, (2) that should the

In re Vinson

district attorney desire to file new petitions for these same charges, only the word "petition" should appear on the new documents, (3) that any and all charges which might be brought against the child be in separate petitions and in separate file folders, (4) that no numbering system on any new charges should be used which would in any way indicate that the child had a previous record within the juvenile court of the Eighteenth Judicial District, (5) that any new petitions be forwarded to the chief district judge for hearing by him or some other judge assigned by him to hear such petitions, and (6) that under no circumstances should any petitions other than new petitions filed in accordance with this order be transferred to the chief district judge and that a copy of the order not be transferred to him.

On 15 June 1978, another order was entered by the district court extending the previous order to include other charges pending in the child's file.

Meanwhile, on 7 June 1978, a new juvenile petition was obtained in the case at bar, a summons was issued, and the child was ordered detained for five days. On 8 June 1978, the public defender was appointed to represent the child. The child's detention order was extended pending hearing on the delinquency petition.

On 15 June 1978, the public defender filed a motion for severance of offenses. He listed offenses noted above and, in addition thereto, the charge of rape alleged to have been committed by the child on 10 May 1978, the motion noting that a separate motion had been filed in which the child moved for dismissal since he was only 13 years of age and was, under the law of the State of North Carolina, incapable of rape.

Also on 15 June 1978, the public defender filed a motion to suppress identification. This motion disclosed that pursuant to the district court order noted above the child had been charged in new petitions with the following charges in addition to that at bar: (1) Crime against nature on 10 May 1978, (2) rape on 10 May 1978, (3) larceny on 2 May 1978, (4) armed robbery on 10 May 1978, (5) larceny on 3 May 1978, and (6) armed robbery on 8 May 1978.

This motion alleged that the Greensboro Police Department violated G.S. 15A-502(c) in taking photographs of this 13-year-old child. It also alleged that actions of Detective Allen, in showing photographs of the child, had unnecessarily tainted the identification by the alleged victims if they had in fact identified the child.

On 3 July 1978, an order ruling on these motions was entered in open court. The court ordered, *inter alia*, that (1) a 13-year-old child cannot be charged with the crime of rape in North Carolina, (2) the child was entitled to have the petitions tried and adjudicated separately from each other, (3) the motion for different trial judges for each petition was reserved pending the particular judge's determination as to whether a fair trial could be held and (4) the child's statement was suppressed on the ground that the child was made to believe that he had been abandoned to the police by hostile and nonsupportive parents and that police had not obtained an affirmative waiver of child's right to counsel. The court reserved ruling on the motion to suppress the identification. The court's findings of fact indicated that the child had been apprehended by Detective Allen, was placed in handcuffs and taken to the Greensboro Police Department at 9:40 p.m. on 10 May 1978. The parents stated in the presence of the child that they wanted nothing further to do with him, and that the police could take him because they "knew that he would steal." The child remained at the police station until 11:30 p.m. when he signed the police waiver form and was then questioned by Detective Allen until approximately 1:30 a.m. Detective Allen did advise the parents and the child of their constitutional rights but at no time asked for or received an affirmative waiver of the child's right to an attorney.

At the delinquency hearing on this armed robbery petition on 16 June 1978, counsel again moved to suppress the identification of the child by the prosecuting witness, Mrs. Maude Vaden, prior to any evidence presented by the State. Evidence at the *voir dire* tended to show:

Detective Allen testified that she did exhibit several photographs, including this child's, to Mrs. Vaden; that Mrs. Vaden identified the child upon reaching his photograph in the group of pictures; that Mrs. Vaden stated she had known the child's mother since before he was born and that she had "sold Mrs. Vinson the sheets that was used when Jerry was born;" that

she didn't know him by name but knew he was Mr. and Mrs. Vinson's child. On cross-examination the detective stated that she was aware of the State law preventing the photographing of children but she "did it anyway;" that the usual procedure of the Greensboro Police Department is to photograph only the juveniles involved in serious offenses; that she recalled talking to the public defender about a lineup but did not recall agreeing to one on any particular date. On redirect she stated that she considered she had authority to take the photographs pursuant to a Greensboro City Ordinance; and that Captain S. B. Simpson had told her the city ordinance would supersede the State statute.

Mrs. Vaden testified that she had known the child's parents for 20 or 25 years; that she had seen the child at his home; that he had been to her house twice; that he came to her house and beat her over the head so that it was difficult for her to remember anything; that she did select the child's picture from the group given to her by Detective Allen; that she later went to a lineup at the police department and identified the child from the group. On cross-examination Mrs. Vaden was shown the respondent and testified, *inter alia,* as follows:

> He looks exactly like the boy but I was thinking he was a little bit taller than that but I think that was the boy. I am not sure.
>
> . . . .
>
> Well, if that is the boy, it is not him. It is his brother but —. Yes, the Vinsons have several children. Some of them are about the same age and they look very much alike. I am not sure that this is the boy. His hair is different or something. Some changes have been made in him, if it is him. I am not sure that it is him. But it's bound to be his brother.
>
> . . . .

Following this *voir dire* testimony, the court denied the child's motion to suppress Mrs. Vaden's identification on the ground that the identification was made from prior knowledge of him.

The court then proceeded to hearing. Mrs. Vaden testified that the child came to her door on 10 May 1978 and told her that

he wanted a drink of water; that she took him down the hallway, went to the refrigerator and gave him a glass of water when her phone rang; that she went to answer the phone and left some money on top of the refrigerator; that it was gone the next day and no one had been in her kitchen but him; that as she went to the living room, the child pulled her over in front of the fireplace and tied a dish towel around her eyes and pushed her over and beat on her and hit her on the head; that he took her down the hallway to her bedroom and threw her down on the bed and "pulls my clothes, dress over my face and removed the rest of it and I [kept] kicking and kicking and pushing him away from me;" that "he tried to compel me and threatened killing me unless I used my mouth, if you know what I mean;" that when he first started abusing her, he made her give him $200.00 from her pocketbook; that he put something cold next to her head and told her that it was a gun and that if she screamed or told anyone he would kill her and started beating on her again; and that she fell to the floor unconscious. When she woke up, he was gone. He had on "what boys that age ordinarily wear, but he unzipped his pants and pushed them down over his knees and his underwear;" that he cut her telephone line with a pair of scissors. Mrs. Vaden's testimony concerning the identification of the child at hearing was essentially the same as that adduced on the *voir dire*.

Child's counsel moved for nonsuit which was denied. Child presented no evidence. The trial court adjudicated the child delinquent for committing the acts alleged in the petition.

The trial court then inquired of counsel if he was ready to proceed with the disposition stage of the hearing. The public defender replied that he would like to produce information from a mental health clinic but that it was not ready at that time. Counsel also objected to the trial court's considering any accusation at disposition for which there was no adjudication of delinquency. The trial court, however, proceeded to the disposition hearing and specifically asked the district attorney, "[H]ow many matters have been retained by the Greensboro Police Department regarding Jerry Vinson?"

The assistant district attorney then told the court of the various charges pending against the child including assault, larceny and receiving. The court inquired about another rape

charge and was told it had been dismissed. The court was also advised that the child had been previously placed on probation. Detective Allen told the court the statements made to her by the child concerning his sexual acts with Mrs. Vaden and Mrs. Breedlove. The court was further advised that the child had been adjudicated a delinquent for glue sniffing by a previous judge. The public defender once again unsuccessfully requested the trial court for an opportunity to send for people from the mental health center.

At the conclusion of this, the trial court ordered:

On disposition, I am going to find that the child's behavior constitutes a severe threat to the persons and property in this community; that there is no community based resources including community based residential care which would be successful considering the nature and severity of the offenses committed and likewise that he could not adjust in his own home or on probation and I am going to commit him to the Department of Human Resources . . . and order that he not be released prior to his 18th birthday. I am going to order that they give him any and all necessary psychological counselling and treatment while he is there and pending his being transported to the appropriate facility by the Court Counsellor he is to remain in the custody of the Court.

A written commitment order was entered accordingly. In the written order, the court entered findings of fact "that the child began committing sexual assaults at age 9; that he has continued to commit crimes of a sexual nature including the rape and attempted rape of elderly women; and that he is a dangerous and vicious sex offender, despite his being only 13 years of age."

Following entry of the foregoing judgment, the child entered notice of appeal to the North Carolina Court of Appeals and the public defender was appointed to represent him on appeal. The Court of Appeals found, one judge dissenting, only that Mrs. Vaden's identification of respondent was sufficient to survive nonsuit. The Court of Appeals did not address the procedural irregularities brought forward on this appeal.

---

*In re Vinson*

---

*Attorney General Rufus L. Edmisten by Associate Attorney Steven Mansfield Shaber for the State.*

*Public Defender Wallace C. Harrelson for the respondent.*

CARLTON, Justice.

Respondent attacks both the adjudicatory and dispositional stages of his proceeding. With respect to the adjudicatory hearing, respondent presents essentially three issues: (1) Did the trial court err in allowing testimony at *voir dire* about identification of respondent by photograph? (2) Did the trial court err in denying his motion for nonsuit? (3) Did the trial court err in adjudicating respondent as a delinquent child?

With respect to the dispositional hearing, respondent presents again essentially three issues: (1) Did the trial court err in immediately proceeding to the dispositional stage over respondent's objection? (2) Did the trial court err in hearing evidence about acts of respondent which had not been adjudicated delinquent acts? (3) Did the trial court fail to make sufficient findings of fact to support its commitment order?

We discuss these issues in order and, for the reasons stated, reverse the Court of Appeals' decision which affirmed the proceedings in the trial court.

I

The issues raised by respondent's appeal strike at the heart of our juvenile justice laws. To address these contentions with the gravity they merit, it is first necessary to investigate the history and policy behind North Carolina's Juvenile Code. The present Juvenile Code is codified at G.S. 7A-277 through G.S. 7A-289.34. We note at the outset that these and other statutes pertaining to juveniles have been repealed by the 1979 General Assembly effective 1 January 1980 at which time they will be replaced by a new North Carolina Juvenile Code codified as G.S. 7A-516 through G.S. 7A-740. Realizing that our decision will be filed shortly before implementation of the new Juvenile Code, this opinion will, at times, discuss both present law and the implications of the new Code on the issues raised.

The predecessor to our Juvenile Code was enacted into our law in 1919, following a prototype begun in Cook County, Illinois. That prototype introduced an innovation into juvenile law at the time — juveniles were to be separated from adult criminals and dealt with in a separate, more flexible system. M. Thomas, Juvenile Corrections: A Brief History and Juvenile Jurisdiction: North Carolina's Laws and Related Cases 6-8 (1972). *See also State v. Monahan*, 15 N.J. 34, 104 A. 2d 21 (1954); 48 A.L.R. 2d 663, 665.

The reason for this separation was clear to courts of the time. Reviewing our own Juvenile Code statutes in 1920, Justice Hoke stated:

> [S]uch legislation deals and purports to deal with delinquent children not as criminals, *but as wards* and undertakes rather to give them the control and environment that *may lead to their reformation* and enable them to become law-abiding and useful citizens . . . . (Emphasis added.)

*State v. Burnett*, 179 N.C. 735, 742, 102 S.E. 711, 714 (1920).

This view of the state as *parens patriae* to a delinquent child has continued for the most part unabated in the 60 years since those words were first written. Thus, in 1969, Justice Huskins speaking for this Court, wrote in *In re Burrus*, 275 N.C. 517, 169 S.E. 2d 879 (1969), *aff'd sub nom., McKeiver v. Pennsylvania*, 403 U.S. 528, 91 S.Ct. 1976, 29 L.Ed. 2d 647 (1971), that under the Juvenile Code, the court owed "the constant duty . . . to give each child subject to its jurisdiction such oversight and control as will *conduce to the welfare of the child* and to the best interest of the State [Citation omitted]." (Emphasis added.) *Id.* at 531, 169 S.E. 2d at 887-88.

The once innovative and idealistic spirit of juvenile codes, however, has been strongly criticized in its application. In 1970, while reviewing *In re Burrus, supra,* and upholding the decision of this Court, the United States Supreme Court wrote:

> [T]he fond and idealistic hopes of the juvenile court pro-ponents and early reformers of three generations ago have not been realized. The devastating commentary upon the

system's failure as a whole . . . reveals the depth of disappointment in what has been accomplished.

*McKeiver v. Pennsylvania, supra* at 543-44, 91 S.Ct. at 1985, 29 L.Ed. 2d at 660.

And in a footnote it quoted a juvenile justice task force report of the 1967 President's Commission on Law Enforcement:

"In fact [the juvenile justice system] frequently does nothing more nor less than deprive a child of liberty without due process of the law—knowing not what else to do and needing, whether admittedly or not, to act in the community's interest even more imperatively than the child's. In theory it was to exercise its protective powers to bring an errant child back into the fold. In fact there is increasing reason to believe that its intervention reinforces the juvenile's unlawful impulses . . . ."

403 U.S. at 544, 91 S.Ct. at 1986, 29 L.Ed. 2d at 660, note 5. *See also Kent v. United States,* 383 U.S. 541, 556, 86 S.Ct. 1045, 1054, 16 L.Ed. 2d 84, 94 (1966).

To correct these abuses, the Supreme Court in a series of decisions has introduced a far more formal element in juvenile proceedings and has held that due process mandates that a juvenile must be convicted beyond a reasonable doubt, *In re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed. 2d 368 (1970); that a juvenile has the right to counsel, the right to be properly notified of the charges against him or her, the right to confront and cross-examine witnesses and the privilege against self-incrimination. *In re Gault,* 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed. 2d 527 (1967); and that a juvenile has the right not to be subjected to double jeopardy. *Breed v. Jones,* 421 U.S. 519, 95 S.Ct. 1779, 44 L.Ed. 2d 346 (1975).

The trend of our courts in insisting on more stringent due process requirements for juveniles has not resulted, as is sometimes argued, from a softened attitude that children cannot commit violent acts. Indeed, we believe this trend has resulted from an increasing awareness that youth crime is serious and widespread and that society demands that courts deal strictly with violent youth offenders. It has been stated that the juvenile crime rate is the most serious problem confronting the juvenile

justice system today. Of all those arrested in North Carolina for crimes committed in 1978, 58.4% were 29 years of age and under, 41.8% were 24 and under, 32.9% were 21 years of age and younger, and 8.89% were 16 and under. N.C. Department of Justice, Police Information Network, *Crime in North Carolina: 1978 Uniform Crime Report* 110-111 (1979). National statistics reveal that while young offenders from ages 15 to 18 comprise 7% of the total population, they account for 16% of all violent crime arrests and 46% of arrests for major crimes against property. North Carolina Department of Crime Control and Public Safety, *A Crime Control Agenda for North Carolina* 338 (1978).

Our own General Assembly has responded to these alarming statistics. A new Juvenile Code was enacted by the 1979 General Assembly providing stricter measures for dealing with serious youth crime. For example, as discussed below, the fingerprinting and photographing of serious youth offenders under specified procedures will be permissible effective 1 January 1980. This will allow our criminal justice system to more easily identify and track serious youth offenders.

Commensurate with this toughened attitude towards youth crime is the court system's responsibility to assure due process proceedings for youthful offenders. Court decisions in recent years have recognized the gap between the original conception of the system "and its realities." "With the exception of *McKeiver v. Pennsylvania, [supra,]* the Court's response to that perception has been to make applicable in juvenile proceedings constitutional guarantees associated with traditional criminal prosecutions."[1] *Breed v. Jones*, 421 U.S. at 528-29, 95 S.Ct. at 1785, 44 L.Ed. 2d at 355. Thus, in *In re Gault, supra,* the Court concluded that a delinquency proceeding subjecting a juvenile to the loss of his liberty for years is comparable in seriousness to a felony prosecution, stating that the term "delinquent" had "come to involve only slightly less stigma than the term 'criminal' applied to adults." 387 U.S. at 24, 87 S.Ct. at 1441, 18 L.Ed. 2d at 544.

---

1. We note that in at least one recent United States Supreme Court case, *Fare v. Michael C.,* --- U.S. ----, 99 S.Ct. ----, 61 L.Ed. 2d 197 (1979), the Court has held a juvenile has no constitutional right to consult with his or her probation officer prior to questioning by the police. The case, however, re-emphasized the *Gault* holding that the juvenile has a right to counsel at these times and distinguished probation officers as being people not within the purview of 'counsel.' We feel this in no way erodes due process rights of juveniles. *See also, Riley v. Illinois,* 435 U.S. 1000, 98 S.Ct. 1657, 56 L.Ed. 2d 91 (1978) (mem.).

There is very little to distinguish a hearing such as that held in the case at bar from a traditional criminal prosecution. Indeed, in view of the seriousness of the acts allegedly committed by this respondent and the possibility of long term institutionalization, society should demand a formal adversarial proceeding. In such a case, it becomes incumbent upon the court system to safeguard the rights of those alleged to be delinquent just as much as it would protect the rights of any adult person facing a possible prison sentence. Those who cry for harsher treatment of youthful offenders can surely not argue that accused children should have fewer rights than adult offenders when they risk much the same penalties.

We address the issues raised by this appeal with these factors in mind. Our attempt is to carefully balance the State's police power interest in preserving order and its *parens patriae* interest in a delinquent child's welfare with the child's constitutional right to due process.

## II.

### ADJUDICATORY HEARING

### A.

[1]  Respondent first contends that the trial court erred in allowing testimony of a photographic lineup in which his photograph was displayed. He relies on G.S. 15A-502 which, at the time, provided:

§ 15A-502. Photographs and fingerprints.—(a) A person charged with the commission of a felony or a misdemeanor may be photographed and his fingerprints may be taken for law-enforcement records only when he has been:

(1) Arrested or committed to a detention facility, or

(2) Committed to imprisonment upon conviction of a crime, or

(3) Convicted of a felony.

(b) This section does not authorize the taking of photographs or fingerprints when the offense charged is a misdemeanor under Chapter 20 of the General Statutes,

"Motor Vehicles," for which the penalty authorized does not exceed a fine of five hundred dollars ($500.00), imprisonment for six months, or both.

(c) *This section does not authorize the taking of photographs or fingerprints of a "child" as defined for the purposes of G.S. 7A-278(2), unless the case has been transferred to the superior court division pursuant to G.S. 7A-280.*

(d) This section does not prevent the taking of photographs, moving pictures, video or sound recordings, fingerprints, or the like to show a condition of intoxication or for other evidentiary use.

(e) Fingerprints or photographs taken pursuant to subsection (a) may be forwarded to the State Bureau of Investigation, the Federal Bureau of Investigation, or other law-enforcement agencies. (Emphasis added.)

The State argues that the statute prevents the taking of photographs or fingerprints of children only for "law-enforcement records" as noted in subsection (a). It asserts that subsection (d) expressly exempts the restriction from situations where the photographs or fingerprints would be for "other *evidentiary* use." Here, State argues, respondent's photograph was obviously for an "evidentiary use," and suggests that while the statute does not *authorize* the taking of photographs or fingerprints of children, neither does it *prohibit* the practice. We do not agree with any such interpretation of the statute. The obvious and unambiguous intent of our legislature was to prohibit the fingerprinting and photographing of any delinquent child, as defined by G.S. 7A-278(2), except in those limited cases where the child had been transferred to the superior court pursuant to G.S. 7A-280.

[2] However, it is *not* our holding, on the record before us, that the trial court erred in failing to suppress the victim's identification of the child. The trial court found that Mrs. Vaden's identification was made on the basis of her prior knowledge of respondent and not on the basis of the illegal photographs. There is sufficient evidence in the record to support this finding and it is therefore binding on us on appeal. However, we note that the Greensboro Police Department improperly photographed respondent and it would have been error for the trial court to allow ad-

mission of any testimony resulting from this illegal procedure into evidence at hearing.

As part of the total revision of the North Carolina Juvenile Code, we also further note that our legislature has recently amended G.S. 15A-502(c). That subsection now provides, "This section does not authorize the taking of photographs or fingerprints of a juvenile except under G.S. [7A-596] through G.S. [7A-602]."

This amendment became effective upon ratification, 8 June 1979. The new Juvenile Code is not effective until 1 January 1980. 1979 Session Laws, Chapter 815, Section 5. It is obvious therefore that an ambiguity exists in our law in this area until 1 January 1980 since the referenced sections of the new Juvenile Code are not yet the law. We think the better practice would be for law enforcement agencies and the trial courts to abide by the provisions of former G.S. 15A-502(c), keeping in mind the new Code changes, until the new Code is effective. Indeed, new Code provisions on this question are extensive. Nontestimonial identification is defined by new G.S. 7A-596 to include identification "by fingerprints, palm prints, footprints, measurements, blood specimens, urine specimens, saliva samples, hair samples, or other reasonable physical examination, handwriting exemplars, voice samples, photographs, and lineups or similar identification procedures requiring the presence of a juvenile."[2] The statute provides that nontestimonial identification procedures "shall not be conducted on any juvenile without a court order issued pursuant to this Article." The authorized order may be issued by any judge of the district court or of the superior court "*upon request of a prosecutor.*" (Emphasis added.) G.S. 7A-596. The request for the order may be made (1) prior to taking a juvenile into custody, and (2) after custody and prior to the adjudicatory hearing, or (3) prior to trial in superior court where a case is transferred to that court. G.S. 7A-597.

New G.S. 7A-598 provides that the order may issue *only* on affidavit(s) *sworn to* before the judge which establish the following grounds: (1) that there is probable cause to believe that an of-

---

2. We note that the statute neither authorizes nor forbids the use of the breathalyzer test or polygraph, *Cf.* North Carolina Juvenile Code Revision Committee, 1979 Report 185 (1979) (Citing rationale for this silence).

fense has been committed which would be punishable by imprisonment for more than two years if committed by an adult, that is, this procedure is specifically limited to situations which would constitute a general misdemeanor or felony, or (2) that there are reasonable grounds to suspect that the juvenile named or described in the affidavit committed the offense, and (3) "that the results of specific nontestimonial identification procedures will be of material aid in determining whether the juvenile named in the affidavit committed the offense."

New G.S. 7A-599 provides that, upon a showing that the grounds specified above exist, the judge may issue the order but only in accordance with the procedures set forth in Article 14 of Chapter 15A of the General Statutes which delineate procedures used for adult defendants. Reference to the designated statutes in Article 14 of Chapter 15A for adult defendants is essential to comply with the new Code provisions for juveniles. For example, trial judges should pay particular attention to G.S. 15A-278 which specifies the necessary contents for the order. G.S. 15A-278(5) provides that the juvenile would be entitled to be represented by counsel at the procedure and would be entitled to the appointment of counsel if he cannot afford to retain one. Law enforcement should note that G.S. 15A-278(6) requires that the child would not be subjected to any interrogation or asked to make any statement during the period of his appearance except that required for voice identification.

New G.S. 7A-600 provides that a juvenile in custody for or charged with an offense which would be punishable by imprisonment for more than two years if committed by an adult may request that nontestimonial identification procedures be conducted upon himself. Should the trial court determine that such a procedure would be a material aid to the juvenile's defense, he must order the State to conduct the procedures.

New G.S. 7A-601 provides detailed instructions for the destruction of records resulting from nontestimonial procedures in certain situations.

While our legislature has wisely provided a sensible procedure for nontestimonial identification procedures for juveniles

in light of the substantial percentage of crimes being committed by young people and the necessity for tracking serious youth offenders, it has also indicated its clear intent that only those procedures authorized by this new statute will be tolerated. New G.S. 7A-602 provides, "Any person who willfully violates provisions of this Article which prohibit conducting nontestimonial identification procedures *without an order issued by a judge shall be guilty of a misdemeanor.*" (Emphasis added.) Although our legislature has responded to the demands of the law enforcement community in providing a means for the fingerprinting and photographing of juveniles along with 23 other states which have recently enacted similar legislation, it is clear from the last-quoted statute that our law will not tolerate nontestimonial identification procedures inconsistent with the guidelines provided by the new Juvenile Code.

## B.

Respondent next contends that the trial court erred in denying his motion for nonsuit or dismissal at the conclusion of the State's evidence and at the conclusion of all the evidence. He argues that the testimony of Mrs. Vaden raised only a suspicion or conjecture as to his identity. We agree.

[3] A juvenile respondent is entitled to the application of the same rules in weighing the evidence against him on a motion for nonsuit or to dismiss as if he were an adult criminal defendant. *In re Alexander*, 8 N.C. App. 517, 174 S.E. 2d 664 (1970). The applicable rules are well established: Upon a motion for judgment of nonsuit in a criminal action, the evidence must be considered by the court in the light most favorable to the State, all contradictions and discrepancies therein must be resolved in its favor and it must be given the benefit of every reasonable inference to be drawn from the evidence. *State v. Bruton*, 264 N.C. 488, 142 S.E. 2d 169 (1965). When all of the evidence is considered, the question for the court is whether there is substantial evidence to support a finding both that an offense charged in the warrant or bill of indictment has been committed and that the defendant committed it. *State v. Bass*, 253 N.C. 318, 116 S.E. 2d 772 (1960). If, when the evidence is so considered, it is sufficient only to raise a suspicion or conjecture as to either the commission of the offense or the

identity of the defendant as the perpetrator of it, the motion for nonsuit should be allowed. *State v. Guffey*, 252 N.C. 60, 112 S.E. 2d 734 (1960). This is true even though the suspicion so aroused by the evidence is strong. *State v. Chavis*, 270 N.C. 306, 154 S.E. 2d 340 (1967).

In its opinion, the Court of Appeals addressed only this assignment of error and affirmed the trial court's denial of respondent's motion for judgment of nonsuit. The majority found the evidence sufficient to connect respondent with the commission of the offense. Judge Webb dissented, stating his belief that Mrs. Vaden did not sufficiently identify the respondent to support a finding that he was the person who assaulted her.

[4]  We agree with Judge Webb's dissent. The evidence raises no more than a suspicion or conjecture as to the identity of respondent as the perpetrator. While she stated at one point that respondent looked just like the boy that robbed her, most of her expressions indicated serious doubt. For example, at one point she stated, "I am not sure that this is the boy."

We hold that the State's evidence created only a suspicion that respondent had committed the act with which he was charged. The motion for nonsuit or dismissal should have been allowed. *See In re Byers*, 295 N.C. 256, 244 S.E. 2d 665 (1978); *State v. Clyburn*, 273 N.C. 284, 159 S.E. 2d 868 (1968); *State v. Cutler*, 271 N.C. 379, 156 S.E. 2d 679 (1967); *State v. Hewitt*, 34 N.C. App. 109, 237 S.E. 2d 311 (1977), *aff'd*, 294 N.C. 316, 239 S.E. 2d 833 (1978).

C.

[5]  By his next assignment of error, respondent "submits that the law in this State on the degree of proof required in a juvenile case is very vague and has never been discussed by this . . . Court." We do not believe that any serious doubt remains in North Carolina on the question of the quantum of proof required in a juvenile delinquency proceeding. The issue was resolved by the United States Supreme Court nearly a decade ago in *In re Winship, supra.* There, it was said: "In sum, the constitutional safeguard of proof beyond a reasonable doubt is as much required

during the adjudicatory stage of a delinquency proceeding as are those constitutional safeguards applied in *Gault* . . . ." 397 U.S. at 368, 90 S.Ct. at 1075, 25 L.Ed. 2d at 377.

The rule has been followed in North Carolina. *See, e.g., In re Gooding,* 23 N.C. App. 520, 209 S.E. 2d 295 (1974); *In re Owens,* 22 N.C. App. 313, 206 S.E. 2d 342 (1974); *In re Roberts,* 8 N.C. App. 513, 174 S.E. 2d 667 (1970); *In re Alexander, supra.*

We also note that G.S. 7A-635 of the new Juvenile Code provides that "[t]he allegations . . . alleging the juvenile is delinquent shall be proved beyond a reasonable doubt."

We think the trial judge in the instant case correctly understood the required quantum of proof. His order expressly stated his findings "beyond a reasonable doubt."

### III.

### DISPOSITIONAL HEARING

### A.

[6] Respondent next contends that the trial court erred in immediately proceeding to the dispositional stage of the proceedings over his objection.

The record discloses the following exchange between the trial court and counsel for respondent:

COURT: Motion denied. For the record, at this time the Court adjudicates the child to be delinquent in that he did commit the acts as alleged in the petition. *Are we ready to proceed with the disposition?* (Emphasis added.)

. . . .

MR. HARRELSON [respondent's counsel]: Judge, from our standpoint, I have been attempting to get a report from the Mental Health Clinic which I think Your Honor would want to hear prior to hearing the matter of disposition. Mr. Byrd advises me that it is not ready. Would you enlighten us as to when it might be ready?

In re Vinson

MR. BYRD: I am not sure. He has been seen by two of the doctors there. I called a few minutes ago. He said it was not ready. I don't know whether that means later today or one day next week.

. . . .

MR. HARRELSON: Judge, we would like an opportunity if Your Honor can see fit, to present the testimony of the people from the Mental Health prior to any disposition.

. . . .

COURT: Is there anything on disposition for the child?

. . . .

MR. HARRELSON: Nothing other than we would like the opportunity to get the people from Mental Health here or their report, as the case may be, Your Honor please.

The record indicates that the court immediately proceeded to the dispositional phase of the proceeding and entered the order committing the child to the Division of Youth Services, Department of Human Resources. It is without question from the record that counsel for respondent indicated to the trial court that respondent wished to present evidence prior to disposition and that the trial court proceeded over respondent's objections. The question posed is whether such procedure was proper.

We think the confusion in this area results from the wording of the present version of G.S. 7A-285. One paragraph in that statute provides that:

At the conclusion of the adjudicatory part of the hearing, the court may proceed to the disposition part of the hearing, or the court may continue the case for disposition after the juvenile probation officer or family counselor or other personnel available to the court has secured such social, medical, psychiatric, psychological or other information as may be needed for the court to develop a disposition related to the needs of the child or in the best interest of the State. The disposition part of the hearing may be informal, and the court may consider written reports or other evidence concerning the needs of the child.

Another paragraph in that same statutory section provides, "The child or his parents . . . shall have an opportunity to present evidence if they desire to do so, or they may advise the court concerning the disposition which they believe to be in the best interest of the child."

Hence, G.S. 7A-285 appears to establish three inconsistent standards: (1) The court *may* immediately proceed to disposition, (2) the court has the *discretion* to hear psychological reports, and (3) the child has the absolute *right* to present evidence prior to disposition. In the case at bar, respondent expressed his obvious desire to present psychological evidence which was not yet in final form. The trial judge refused to wait. This refusal, respondent argues, constitutes an abuse of the trial court's discretion.

We are aware that in many juvenile cases, perhaps in a substantial majority of them, little purpose would be served by postponing the dispositional hearing. In those situations, the trial court has before it all the helpful information needed by it to reach an appropriate disposition. However, in a case even approaching the seriousness of that disclosed by the record before us, and most particularly when the juvenile requests it, we believe the better practice is for the trial court to postpone the dispositional hearing until all available information is at hand.

Such a practice would clearly fit into the trend emerging throughout the country. We note that the American Bar Association advocates a *formal* disposition hearing in juvenile cases with written notice to the parties concerning the time, place and date sufficiently in advance of the hearing to allow adequate time for preparation. Institute of Judicial Administration/American Bar Association Juvenile Justice Standards Project, *Standards Relating to Dispositional Procedures* § 6.1. The National Advisory Commission on Criminal Justice Standards and Goals goes further and recommends that dispositional hearings be separate and distinct from adjudicatory hearings. National Advisory Commission on Criminal Justice Standards and Goals, *Courts* § 14.5 (1973). Indeed, our own legislature has recently seen fit to provide for a predispositional investigation to *ensure* that a judge base his dispositional decision on those social and psychological reports. *See* 1979 N.C. Session Laws, Chapter 815 to be codified as G.S. 7A-639 effective 1 January 1980. Obviously, however, this

newly enacted statute has no application to the case at bar and our holding must be based on an evaluation of the trial court's compliance with our present G.S. 7A-285.

Respondent here *was* provided his statutory right to be heard but wished to be heard on evidence not yet available. While the trial court's speedy denial of respondent's request for a psychological report may not have been the better practice under G.S. 7A-285, it was not so irregular as to be improper. On the basis of the facts before us and our interpretation of our present statute, therefore, this assignment of error is overruled.

Realizing again the our decision will be made public in close proximity to the time of implementation of the new North Carolina Juvenile Code, we deem it necessary to comment on the statutes of the new Code which would be applicable to this assignment of error. This is particularly so since we perceive that our holding under this assignment of error would have been different had the new Code been in effect at the time of this respondent's hearing.

New G.S. 7A-639, effective 1 January 1980, provides in pertinent part:

> The judge shall proceed to the dispositional hearing upon receipt of sufficient social, medical, psychiatric, psychological, and educational information. No predisposition report shall be submitted to or considered by the judge prior to the completion of the adjudicatory hearing. The judge shall permit the juvenile to inspect any predisposition report to be considered by him in making his disposition unless the judge determines that disclosure would seriously harm his treatment or rehabilitation or would violate a promise of confidentiality. *Opportunity to offer evidence in rebuttal shall be afforded the juvenile and his parent, guardian, or custodian at the dispositional hearing . . . .*

New G.S. 7A-640, also effective on 1 January 1980, provides that:

> The dispositional hearing may be informal, and the judge may consider written reports or other evidence concerning the needs of the juvenile. The juvenile and his parent, guard-

ian, or custodian *shall have an opportunity to present evidence,* and they may advise the judge concerning the disposition they believe to be in the best interest of the juvenile. (Emphasis added.)

While the legislature, in enacting the new Juvenile Code, did not make crystal clear the extent to which the trial court must postpone the dispositional hearing in order to give the juvenile an opportunity to be heard, we think the emphasized portions of the statutes noted above make clear the legislative intent that the dispositional hearing *must* be continued for the respondent to present evidence when he requests such a continuance. This is particularly so since new G.S. 7A-632 provides, "The judge may continue at any time any case to allow additional factual evidence, social information or other information needed in the best interest of the juvenile or in the interest of justice."

Again, we realize that a continued dispositional hearing will be unnecessary in the vast majority of cases. We do not seek here to diminish the trial court's much-needed discretion in those cases. We merely suggest that effective 1 January 1980, before a trial court can commit a juvenile adjudicated delinquent to a State training school, it must, upon specific request of the juvenile or his counsel, continue the dispositional hearing for a reasonable time to allow the juvenile to present evidence to the court about his disposition. The period of time required for the continuance is a matter in the trial court's discretion but we believe it should take into account the source of the evidence which the juvenile seeks to present. This does not, of course, alter the trial court's authority to retain the juvenile in custody pending the dispositional hearing, pursuant to other statutory authority.

The statutory right for the juvenile to present evidence before his disposition is meaningless unless he is given time to prepare it. Before the critical decision to remove a child from society is made, we believe the child's right to present evidence should be zealously guarded This is not a 'grudging gesture to a ritualistic requirement.' It is 'of the essence of justice.' *Cf. Kent v. United States,* 383 U.S. 541, 561, 86 S.Ct. 1045, 1057, 16 L.Ed. 2d 84, 97 (1966) (Speaking of the child's right to counsel).

B.

Respondent next contends that the trial court erred at the dispositional hearing in hearing evidence about acts for which he had not been adjudicated delinquent.

Respondent's concern over the trial court's handling of his dispositional hearing is best understood by quoting an exchange between the court and counsel. Following the trial court's adjudication that respondent was a delinquent child, the record discloses in pertinent part the following exchange:

COURT: Does he have a prior juvenile record?

MR. BYRD: Your Honor, he had been placed on probation a month prior to the date of this incident, so I had known him for about three weeks to a month prior to this incident and he was placed on probation for shoplifting, took two electric auto-race games from Jordan Marsh at Four Seasons valued at $4.30.

MR. MOORE: Wasn't there some other articles he took too?

MR. BYRD: Two entail racing games—I am sorry—three tubes of glue, that's what it was. Would you care to see that Order?

COURT: All right.

MR. HARRELSON: Judge, we would like an opportunity, if Your Honor can see fit, to present the testimony of the people from the Mental Health prior to any disposition.

COURT: Do you have an (sic) evidence as to disposition?

MR. MOORE: Your Honor, please, except for the Court Order that stands, we have several matters retained by the Greensboro Police Department.

MR. HARRELSON: We OBJECT to anything on disposition, if Your Honor please, unless be adjudication of delinquency.

COURT: Well, OBJECTION OVERRULED.

Q. Detective Allen, would you tell the Court any matters that were—how many matters have been retained by the Greensboro Police Department regarding Jerry Vinson?

MR. HARRELSON: OBJECTION.

COURT: I am not sure I understand the question.

MR. MOORE: Let me rephrase the question.

Q. Detective Allen, have there been any charges, any allegations of delinquency that have been retained by the Greensboro Police Department, Juvenile Division?

MR. HARRELSON: OBJECTION.

COURT: OVERRULED.

A. Yes, there have.

Q. How many have there been?

MR. HARRELSON: OBJECTION.

COURT: OVERRULED.

A. Three others.

Q. What were those specific allegations?

MR. HARRELSON: OBJECTION.

COURT: OVERRULED.

A. There was an assault, a larceny and receiving, and a larceny.

MR. MOORE: And would Your Honor care to hear any particulars of the matters?

COURT: Was obviously more than that. Obviously more than the larceny and receiving and assault.

A. There was one larceny, 7/20/76; one larceny and receiving 12/12/77; and one assault, 4/10/74; and then, of course, the larceny, shoplifting which was adjudicated February 16, '78.

MR. HARRELSON: I OBJECT, move to strike all of this. No evidence he was convicted of any of this other than the one which was handed up to Your Honor.

COURT: Was there not a rape charge contained by the Police Department?

A. There was a petition filed.

COURT: Petition filed?

A. Yes, sir.

COURT: That has been dismissed?

A. Yes, sir.

COURT: That matter cannot be adjudicated?

A. Yes, sir. And with Mrs. Vaden he stated that he also had sexual intercourse with her and I asked him to describe what sexual intercourse was with Mrs. Vaden as I had with Mrs. Breedlove. Again, he stated that he took his thing and put it in her hole and he also tried to get her to suck his thing.

COURT: How old was he at that time, 13?

A. Yes, sir.

COURT: Anything further on disposition?

Q. Did he say anything in the statements about Mrs. Breedlove about the bathtub?

A. Yes, sir, he did.

. . . .

COURT: Is there anything on disposition for the child?

MR. HARRELSON: Nothing other than we would like the opportunity to get the people from Mental Health here or their report, as the case may be, Your Honor please.

Following this exchange, the court then made findings and committed the child to the Division of Youth Services, Department of Human Resources for placement in a State training school.

The trial court's order found "[t]hat the child began committing sexual assaults at age 9; that he has continued to commit crimes of a sexual nature including the rape and attempted rape

of elderly women; and that he is a dangerous and vicious sex offender, despite his being only 13 years of age." Respondent correctly states that there is nothing in the record to substantiate these findings other than the inquiries allowed on disposition, as noted above.

The general rule in North Carolina for adult sentencing is that the trial court has wide latitude to hear evidence at disposition. *State v. Perry*, 265 N.C. 517, 144 S.E. 2d 591 (1965); *State v. Pope*, 257 N.C. 326, 126 S.E. 2d 126 (1962). If the punishment imposed is within statutory limits, there is a presumption that the sentence is regular and valid. That presumption, however, is not conclusive and if the judge by his own pronouncement shows clearly that he imposed the sentence for a cause not embraced within the indictment and the plea, the presumption is overcome and the sentence is in violation of defendant's rights. *State v. Swinney*, 271 N.C. 130, 155 S.E. 2d 545 (1967).

Disposition of a juvenile, however, involves a philosophy far different from adult sentencing. *In re Burrus, supra*, makes clear that a delinquent child is not a "criminal." The inference is that a juvenile's disposition is not intended to be a punishment but rather an attempt to rehabilitate him.

G.S. 7A-286 provides in pertinent part that, "[t]he judge shall select the disposition which provides for the protection, treatment, rehabilitation or correction of the child after considering the factual evidence, the needs of the child, and the available resources, as may be appropriate in each case." We also note that the new Juvenile Code adds little guidance with respect to the trial court's authority to hear matters on disposition such as those disclosed by this record. The new Code provides at G.S. 7A-640 only that, "[t]he dispositional hearing may be informal, and the judge may consider written reports or other evidence concerning the needs of the juvenile." New G.S. 7A-646 provides, "The purpose of dispositions in juvenile actions is to design an appropriate plan to meet the needs of the juvenile and to achieve the objectives of the State in exercising jurisdiction."

With correction foremost in mind, it has been the practice in this jurisdiction to consider all manner of evidence at the dispositional stage. Indeed, the *Rules of Procedure Applicable to*

*Children in the District Court,* commonly referred to as the *Brown Book,* states that "[e]vidence that is material and relevant, including hearsay and opinion, is admissible [at disposition], and entitled to such weight as the judge may deem proper." N.C. Administrative Office of the Courts, *Rules of Procedure Applicable to Children in the District Court* 50 (1977).

The practice of considering a broad spectrum of information at disposition is not unique to North Carolina juvenile law. The pertinent ABA Juvenile Justice Standard recommends:

> 2.3 Information Base.
>
> A. The information essential to a disposition should consist of the juvenile's age; the nature and circumstances of the offense or offenses upon which the underlying adjudication is based, such information *not being limited to that which was or may be introduced at the adjudication;* and any prior record of adjudicated delinquency and disposition thereof. (Emphasis added.)

IJA / ABA Juvenile Justice Standards Project, *supra* at 31.

> The commentary to this section explains:
>
> The kind of information that is relevant and helpful in arriving at a suitable disposition cannot be separated from the goal or goals sought by the disposition and, to some extent, the nature of the dispositional discretion afforded the judge. As a general proposition, it can be said that the stronger the commitment to a benevolent or therapeutic objective, the stronger the claim to broader information about the juvenile and his or her situation. On the other hand, the stronger the commitment to a disposition fashioned on "just desserts" principles, the less need for information, beyond the nature and circumstances of the offense, age, and the prior record of adjudicated delinquency.

*Id.* at 31-32.

North Carolina, with its strong commitment to a *parens patriae* "benevolent objective" thus may properly consider a wide variety of information at disposition. Here, however, respondent argues in effect that consideration of unadjudicated delinquent acts, allegations without proof, transcends the *parens patriae* in-

terest of the State and violates his right to fundamental fairness, as that right has been posited in *In re Winship, supra.*

The same ABA commentary that explains Standard 2.3 goes on to say:

> Nothing in subsections B. and C. prohibits the inclusion of other information relating to prior delinquency. However, such items as "warnings" and arrests, or conclusions about being an important member of a gang—*cf. United States v. Weston*, 448 F. 2d 626 (9th Cir. 1971) (an unsupported charge that the defendant was the chief supplier of heroin for the area led to vacation of the sentence)—should be carefully scrutinized both for accuracy and weight. Since disclosure of all dispositional information is mandatory under Standard 2.4, the risks of false or misleading information are minimized.
>
> The dispositional judge should be cautious, therefore, in drawing conclusions of previous misconduct from information that has not resulted in official action. In *Townsend v. Burke*, 334 U.S. 736 (1948), the Court invalidated a sentence imposed on an uncounseled defendant where the trial judge relied on misinformation, or on an erroneous reading of the defendant's prior record. Where a judge relied on a prior conviction obtained in violation of *Gideon v. Wainwright*, 372 U.S. 335 (1963) for sentencing purposes, the Court once again reversed, *Tucker v. United States*, 404 U.S. 443 (1972). These decisions would appear to have equal applicability in the juvenile delinquency process.

IJA / ABA Juvenile Justice Standards Project, *supra* at 32.

Here, the trial judge apparently considered nonadjudicated matters reaching back to the time respondent was nine years of age. The record is devoid of the source of some of the information and is also devoid of any finding that this information was accurate. While neither the present statute nor the new Code prohibits the consideration of these matters on disposition, we cannot believe that such a consideration was in conformity with the due process rights with which respondent is invested. We think it the far better practice to limit consideration of past delinquent acts in a dispositional hearing to those which have been adjudicated or, at the very least, formally petitioned.

[7] In light of other errors found in respondent's hearing, it is unnecessary for us to determine whether he would be entitled to a new dispositional hearing on the facts before us. However, for the guidance of trial courts henceforth, we hold that, under both present law and the new Juvenile Code, effective 1 January 1980, trial courts giving consideration at a dispositional hearing to unadjudicated acts allegedly committed by a juvenile, unrelated to that for which he stands petitioned, must first determine that such information is reliable and accurate and that it was competently obtained. We do not mean to imply that a full "trial" must be held to make the required determination about the unrelated acts. The trial court should have wide discretion in making the required determination from the sources available to it, but it must make the determination.

C.

Respondent finally contends that the trial court failed to make adequate findings of fact to support the disposition order.

Present G.S. 7A-286 provides in pertinent part:

(5) In the case of a child who is delinquent, the court may commit the child to the Department of Human Resources, for placement in one of the residential programs operated by the Department, provided the court finds that such child meets each of the following four criteria for commitment to an institution and supports such finding with appropriate findings of fact in the order of commitment as follows:

    a. The child has not or would not adjust in his own home on probation or while other services are being provided;

    b. Community-based residential care has already been utilized or would not be successful or is not available;

    c. The child's behavior constitutes some threat to persons or property in the community or to the child's own safety or personal welfare.

    d. If the child is less than 10 years of age or his offense would not be a crime if committed by an adult, the

court must find that all community-level alternatives for services and residential care have been exhausted. . . .

In the present case, the trial court entered its findings by simply reciting the statutory language. Respondent argues that the court erred in finding he was not capable of being rehabilitated in the community pursuant to G.S. 7A-286(5)(a) primarily because it did not wait to consider the proffered but unfinished psychological report.

Sufficiency of fact finding under G.S. 7A-286 has frequently been challenged. In *In re Steele*, 20 N.C. App. 522, 201 S.E. 2d 709 (1974), the Court of Appeals upheld the sufficiency of a commitment order nearly identical with this one. There, the juvenile had appealed saying that, while the judge may have found as a fact that community resources were insufficient, he had not considered evidence of that finding. The Court of Appeals said in a one paragraph decision:

We agree that the statute gives the trial judge ample tools to make a study in order to dispose of the case "to provide such protection, treatment rehabilitation or correction as may be appropriate in relation to the needs of each child subject to juvenile jurisdiction and the best interest of the State." We do not think, however, that it is incumbent upon the trial judge to incorporate detailed findings of fact in his order. We think the order in the instant case was adequate and was supported by the evidence.

*Id.* at 525, 201 S.E. 2d at 711-12.

This opinion of our Court of Appeals, which allows fairly relaxed formal fact finding, did not occur in a vacuum. Fact finding has long been a troublesome issue for juvenile judges. This is so in many instances simply because the judge does not have the necessary clerical help to have an order prepared. In a recent survey, fully 32% of juvenile commitment orders reviewed in North Carolina contained no findings of fact.[4] While we find such an absolute omission disturbing, as it makes appellate review nearly impossible, we do not believe the fact-finding order need

4. Study done by Diane Porter of the Division of Youth Services, reported in the minutes of the Juvenile Code Revision Committee, 31 March 1978.

be as detailed as that advocated by the IJA / ABA Standards which advise:

7.1 Findings of fact and formal requisites.

A. The judge should determine the appropriate disposition as expeditiously as possible after the dispositional hearing, and when the disposition is imposed,

1. make specific findings on all controverted issues of fact, and on the weight attached to all significant dispositional facts in arriving at the disposition decision;

2. state for the record, in the presence of the juvenile, the reasons for selecting the particular disposition and the objective or objectives desired to be achieved thereby;

3. when the disposition involves any deprivation of liberty or any form of coercion, indicate for the record those alternative dispositions, including particular places and programs, that were explored and the reason for their rejection; . . . .

IJA / ABA Juvenile Justice Standards Project, *supra* at 51.

This standard was considered by the drafters of the new Juvenile Code and rejected in favor of a more flexible fact finding order. New G.S. 7A-651 and 7A-652, effective 1 January 1980, provide:

§ 7A-651. *Dispositional order.* —The dispositional order shall be in writing and shall contain appropriate findings of fact and conclusions of law. The judge shall state with particularity, both orally and in the written order of disposition, the precise terms of the disposition including the kind, duration and the person who is responsible for carrying out the disposition and the person or agency in whom custody is vested.

§ 7A-652. *Commitment of a delinquent juvenile to the Division of Youth Services.* —(1) A delinquent juvenile 10 years of age or more may be committed to the Division of Youth Services for placement in one of the residential facilities operated by the Division if the judge finds that the

alternatives to commitment as contained in G.S. 7A-583 [to be codified as 7A-649] have been attempted unsuccessfully or are inappropriate and that the juvenile's behavior constitutes a threat to persons or property in the community.

The required findings, therefore, pursuant to new G.S. 7A-652 are that (1) alternatives to commitment available in G.S. 7A-649 have been unsuccessfully attempted *or* are inappropriate, *and* (2) the juvenile's behavior is a threat. We note that the requirements for commitment are far more stringent under the new Juvenile Code because more dispositional alternatives are available under new G.S. 7A-649.

[8] We encourage juvenile judges to make the findings required by the statutes to support orders of commitment to the Department of Human Resources, Division of Youth Services. However, the essential element in the commitment order is not that it recites detailed findings beyond the four enumerated by G.S. 7A-286(5) or the two tests enumerated in new G.S. 7A-652, but that those enumerated findings are supported by *some evidence in the record of the dispositional hearing.* This is necessary because of the seriousness of the ordered disposition and the probability of review at the appellate level. We therefore hold that, while the final commitment order need not *formally* state all the alternatives considered by a trial judge in committing a child, a finding that alternatives are inappropriate must be supported by some showing in the record that the sentencing authority at least heard or considered evidence as to what those alternative methods of rehabilitating were.

From the record before us, we are unable to find evidence to support the trial court's finding that the four enumerated factors in G.S. 7A-286(5) had been met. This assignment of error is therefore sustained.

Since the motion for nonsuit should have been allowed, we reverse the Court of Appeals and order this proceeding dismissed.

Reversed.

Justice BROCK took no part in the consideration or decision of this case.

Chief Justice BRANCH concurring in result.

I am of the opinion that the crucial questions determinative of this appeal are (1) whether the trial court erred in allowing testimony of a photographic lineup in which the child's photograph was displayed and (2) whether the trial court erred in denying the child's motion for nonsuit. I agree with the holding of the majority on both of these questions. However, the majority of the twenty-seven page opinion is devoted to a discussion of statutes which do not become effective until 1 January 1980. All such discussion is, of course, dictum. I do not believe that this Court should adopt a policy of considering matters which are not properly before it. Admittedly, the content of the majority opinion is a learned and complete consideration of matter which might properly come before us at some future date. However, I do not believe that it is the function of this Court to anticipate questions of law and to deliver, in effect, advisory opinions which cannot have the force of precedent.

Justices COPELAND and EXUM join in this concurring opinion.