616 S.E.2d 385 (2005)
In the Matter of J.B.
No. COA04-901.
Court of Appeals of North Carolina.
August 16, 2005.
Attorney General Roy Cooper, by Special Deputy Attorney General Gayl M. Manthei, for the State.
Susan J. Hall, Fayetteville, for juvenile-appellant.
*386 CALABRIA, Judge.
J.B., a juvenile, appeals a disposition order for twelve months' supervised probation following his adjudication for the offense of involuntary manslaughter. We affirm.
On 11 November 2003, J.B., age fifteen, and his cousin (the "victim") were hunting with two teenage friends. J.B., who was armed with a twelve-gauge shotgun, and the victim, who was unarmed, decided to separate from their friends and continue hunting as a pair. When the victim failed to return from the hunting trip, a search started that evening. The victim was found dead the following day with a shotgun wound to his face. Law enforcement officers determined the victim was shot by someone standing upright at a distance of approximately fifteen to eighteen feet. Near the victim's body was a large, white rock that looked out of place.
On 13 November 2003, law enforcement officers interviewed J.B., who told them that, shortly after he and the victim had paired off, the victim left to find their friends. Thereafter, J.B. thought he heard an animal and turned and fired his shotgun. When J.B. discovered he had shot the victim, J.B. panicked, ran back through the woods, and discarded the shotgun along the way. On the evening of 13 November 2003, J.B. returned to the area to help law enforcement officers find his shotgun.
On 14 November 2003, law enforcement officers asked J.B. to accompany them to the scene to re-enact the shooting. When asked about his location relative to the victim when he fired his shotgun, J.B. said he was seated and much further away than eighteen feet. An officer told J.B. that the evidence was inconsistent with J.B.'s version of events, and J.B. began to cry. J.B. then changed his recounting of how he shot the victim.
J.B. stated he and the victim paired off from their friends, entered the woods, and sat down together. While seated, the victim lit a cigarette. When the victim passed the cigarette to J.B., J.B. put it out and broke it, causing the victim to become "a little bit ill." Although the victim initially got up and walked away, he returned and began circling J.B., who was still seated. The victim said something J.B. could not hear or did not recall, although J.B. admitted the two were not "fussing." The victim then picked up a large rock, which J.B. said the victim appeared to be about to throw at him in a "goofing around" manner. J.B. decided to also "goof around" by leveling his shotgun and pulling the trigger. J.B. was surprised when the gun went off, and as soon as he realized the victim had been shot, J.B. panicked and ran away. J.B. soon returned, however, gathered his clothing and shotgun, ran back through the woods, and threw the shotgun in some vines and bushes along the way. As soon as he arrived home, J.B. took a shower, picked pecans with his grandmother outside, and accompanied his father on an errand. J.B. participated in the ensuing search for the victim, but he did not disclose to anyone the victim's fate or whereabouts. At J.B.'s delinquency proceeding, his stepmother testified, in relevant part, that J.B. was a high school student taking a special studies skills class and exhibited learning difficulties since the fifth or sixth grade. J.B.'s high school principal testified that, aside from a two-day suspension for a tobacco-related incident on school property, J.B. was not a problem at school and had an excellent attendance record up until the victim's death.
*387 At the delinquency proceedings, the trial court received into evidence a memo written by Doctor Heather Scheffler ("Dr. Scheffler"), a licensed clinical psychologist specializing in childhood learning disorders, who started treating J.B. in March 2001. According to the memo, the age-equivalents for J.B.'s IQ ranged from seven years, two months to thirteen years, six months with an average of ten years, eight months, and his IQ was 73. Dr. Scheffler further indicated J.B. had "difficulty in comprehending things, especially complex social interactions, on an age-appropriate level." Dr. Scheffler diagnosed J.B. with the inattentive form of Attention-Deficit/Hyperactivity Disorder. Following the shooting incident, Dr. Scheffler started counseling J.B. weekly.
On 18 November 2003, the State filed a petition alleging J.B. was a delinquent juvenile for the shooting death of the victim. On 19 December 2004, the Harnett County District Attorney's Office filed a motion to transfer the case to superior court upon a finding of probable cause for the charge of involuntary manslaughter. On 16 January 2004, the matter came before the Harnett County District Court as a probable cause hearing on the State's involuntary manslaughter charge and a transfer hearing on the State's motion to have J.B. tried in superior court as an adult. The judge denied the State's transfer motion, and J.B., with the assistance of counsel, signed a transcript of admission for the offense of involuntary manslaughter. The court accepted the admission and proceeded to disposition.
The court placed J.B. on twelve months' probation, under the supervision of a juvenile court counselor, subject to compliance with, inter alia, the special probationary conditions that:
(1) J.B. visit and place flowers on the victim's grave site on the anniversaries of the victim's birth and death dates;
(2) J.B. wear a necklace around his neck with a picture of the victim; and
(3) J.B. not participate in school functions/activities such as football, prom/dances.
J.B. appeals, asserting the trial court abused its discretion in ordering these probationary conditions because the evidence was insufficient to indicate these conditions were in his and the State's best interests. We disagree.
When a trial court places a delinquent juvenile on probation pursuant to N.C. Gen.Stat. § 7B-2506(8) (2004), the court has the authority to impose conditions of probation "that are related to the needs of the juvenile and . . . reasonably necessary to ensure that the juvenile will lead a law-abiding life." N.C. Gen.Stat. § 7B-2510(a) (2004). Under this authority, the court may impose specifically enumerated conditions, including "[t]hat the juvenile satisfy any other conditions determined appropriate by the court." N.C. Gen.Stat. § 7B-2510(a)(14) (2004). "In deciding the conditions of probation, the trial judge is free to fashion alternatives which are in harmony with the individual child's needs." In re McDonald, 133 N.C.App. 433, 434, 515 S.E.2d 719, 721 (1999) (upholding a special probationary condition restricting a juvenile's access to television for a one year period). The trial court's discretion must nevertheless "be exercised within the stated goals and purposes of the Juvenile Code." In re Schrimpsher, 143 N.C.App. 461, 466, 546 S.E.2d 407, 412 (2001). That is, "the record must show that the condition [of probation] is fair and reasonable, related to the needs of the child, . . . calculated to promote the best interest of the juvenile in conformity with the avowed policy of the State in its relation with juveniles . . . [and] sufficiently specific to be enforced." Id., 143 N.C.App. at 468, 546 S.E.2d at 412. On appeal, we will not disturb a trial court's ruling regarding a juvenile's disposition absent an abuse of discretion, which occurs "when the trial court's ruling is so arbitrary that it could not have been the result of a reasoned decision." In re Robinson, 151 N.C.App. 733, 737-38, 567 S.E.2d 227, 229 (2002) (citations and internal quotation marks omitted). With these principals in mind, we turn to J.B.'s contentions.
Initially, J.B. cites In re M.E.B., 153 N.C.App. 278, 569 S.E.2d 683 (2002), where this Court reversed the trial court's imposition of a special condition of probation requiring the juvenile "to wear a sign around her neck, 12" × 12" with the words  I AM A JUVENILE CRIMINAL  written in large *388 letters" whenever she was outside her residence. Id., 153 N.C.App. at 279, 569 S.E.2d at 684. J.B. fails to include any argument as to how M.E.B. offers instruction in the instant case. Moreover, we observe that our holding in M.E.B. was predicated on concerns of "open[ing] the juvenile's records to public display" and impermissibly forcing the juvenile to a de facto form of house arrest where, in order to evade public ridicule, the juvenile was forced to sequester herself in her residence for the length of her probation. Id. at 282, 569 S.E.2d at 686.
None of the instant case's special probationary conditions implicate either of these concerns, which were central to our holding in M.E.B. Specifically, nothing in the probation conditions require publicizing J.B.'s records nor do the conditions present J.B. with the choice of staying at home or enduring public ridicule. The requirement that J.B. wear a necklace with the victim's picture does not include any specific location in which it must be displayed. Notably absent is any requirement for the picture to be displayed publicly as opposed to being enclosed, for example, in a locket that could be worn underneath J.B.'s clothing. Accordingly, our holding in M.E.B. does not control the probationary conditions in the instant case.
J.B. next directs this Court's attention to certain statements of the trial court. Specifically, J.B. cites to Dr. Scheffler's evidence regarding his educational development and contrasts it with the following exchange:
Court:  I've heard all this  I don't consider [J.B.] slow. I mean I've heard what you said about his intellectual  you know, but that has not crossed my mind. What he did afterwards  after this happened doesn't indicate he's intellectually slow. I mean what he did, if you think about it  I mean what he did, if he was an adult in a different fact situation, if we were talking  you know, he could be facing murder charges because of the fact  what he came by, took the weapon, took everything so he wouldn't be implicated and he went off and 
Mr. Harrop: But there's other facts, Judge. I mean 
Court: Oh, I know that. That's what I'm saying.
This colloquy discloses that the trial court was cognizant of Dr. Scheffler's findings concerning J.B.'s below average cognitive functioning; however, when the trial court fashioned J.B.'s probationary conditions, it did not afford this evidence as much weight as the other evidence of J.B.'s actions prior to, during, and after his delinquent act. J.B. does little more than argue the trial court should have accepted his evidence as opposed to the State's evidence. This argument is not supported by the Code, which instead provides that "[t]he court may consider any evidence . . . [it] finds to be relevant, reliable, and necessary to determine the needs of the juvenile and the most appropriate disposition." N.C. Gen.Stat. § 7B-2501(a) (2004) (emphasis added). We, therefore, conclude that the trial court properly considered the evidence before it.
J.B.'s final argument is that the trial court did not take into account his individual needs in determining the conditions of probation. With respect to the first two challenged conditions, that J.B. wear a necklace with a picture of the victim and that J.B. visit the victim's grave site with flowers twice a year, J.B. asserts the trial court could not impose these conditions "unless his therapist concurred that th[ese conditions] would be therapeutic and not cause further emotional damage to [him]." J.B. cites no authority for the proposition that a trial court is required to consult with a therapist or receive a therapist's permission prior to imposing a probationary condition. Indeed, such a pre-requisite would violate N.C. Gen.Stat. § 7B-2506, which "does not contemplate the court vesting its discretion [to fashion dispositional alternatives] in another person or entity," and instead provides that "the court, and the court alone, must determine which dispositional alternatives to utilize with each delinquent juvenile." See In re Hartsock, 158 N.C.App. 287, 292, 580 S.E.2d 395, 399 (2003) (finding that the court unlawfully delegated its authority under this statute when the court conditioned its order placing respondent in residential treatment dependent on a counselor deeming such placement necessary).
*389 With respect to the final condition, that J.B. not participate in school functions or activities such as football or prom dances, J.B. asserts that these activities were his means to interact with individuals his own age. However, J.B. concedes that the evidence before the trial court, both concerning the delinquent act itself and the testimony from Dr. Scheffler, indicates his prior problems with complex social interactions on an age-appropriate level. The trial court did not prohibit all opportunities for social interaction: J.B. is free to interact with individuals his own age in structured environments, such as in school during regular hours or at his family's church where J.B. has been attending youth group functions for several years. The prohibited extracurricular functions and activities involve less-structured, complex interactions of the type that are most likely to pose the greatest danger for inappropriate or delinquent conduct by J.B.
For the foregoing reasons, we affirm the conditions of probation imposed by the trial court in the instant case.
Affirmed.
Judge HUNTER concurs.
Judge JACKSON dissents.
JACKSON, Judge, dissenting.
For the reasons stated below, I must respectfully dissent from the majority's decision to affirm the conditions of probation imposed by the trial court.
Juvenile dispositions in delinquency proceedings are controlled by Chapter 7B, section 2500, of the North Carolina General Statutes. "The purpose of [these] dispositions in juvenile actions is to design an appropriate plan to meet the needs of the juvenile and to achieve the objectives of the State in exercising jurisdiction." N.C. Gen.Stat. § 7b-2500; In re Brownlee, 301 N.C. 532, 551, 272 S.E.2d 861, 872 (1981)(citing the current statute's predecessor statute N.C. Gen.Stat. § 7A-646), distinguished on other grounds by Bailey v. State, 353 N.C. 142, 158, 540 S.E.2d 313, 323 (2000). Accordingly, the court must select a disposition "designed to protect the public" and "to meet the needs and best interests of the juvenile" based on:
(1) the seriousness of the offense;
(2) the need to hold the juvenile accountable;
(3) the importance of protecting the public safety;
(4) the degree of culpability indicated by circumstances of the particular case; and
(5) the rehabilitative and treatment needs of the juvenile indicated by a risk and needs of the assessment.
N.C. Gen.Stat. § 7B-2501(c). Chapter 7B, section 2510(a)(14) of the North Carolina General Statutes further provides that "[t]he court may impose conditions of probation that are related to the needs of the juvenile and that are reasonably necessary to ensure that the juvenile will lead a law-abiding life, including [requiring] the juvenile to satisfy any other conditions determined appropriate by the court." This Court previously has stated that when the court is determining what conditions of probation are appropriate, the trial judge has authority to "fashion alternatives which are in harmony with the individual child's needs." In re McDonald, 133 N.C.App. 433, 434, 515 S.E.2d 719, 721 (1999)(citing In re Groves, 93 N.C.App. 34, 376 S.E.2d 481 (1989)). In making its decision concerning the juvenile's disposition, the court also must exercise "its juvenile jurisdiction" in weighing the State's best interests. In re Brownlee, 301 N.C. 532, 553, 272 S.E.2d 861, 873-74 (1981)(citing In re Vinson, 298 N.C. 640, 260 S.E.2d 591 (1979); In re Burrus, 275 N.C. 517, 169 S.E.2d 879 (1969), aff'd. sub. nom., McKeiver v. Pennsylvania, 403 U.S. 528, 91 S.Ct. 1976, 29 L.Ed.2d 647 (1971)).
Although our Juvenile Code has granted broad authority to the courts in fashioning appropriate dispositions for juveniles, that discretion is not without limitation. In re Schrimpsher, 143 N.C.App. 461, 466, 546 S.E.2d 407, 412 (2001). "[T]his discretion must be exercised within the stated goals and purposes of the Juvenile Code." Id.
In this case, when balancing J.B.'s needs with the State's best interest, the record tends to show that actually it would be adverse *390 to his needs and not in his best interest to require him to visit the victim's grave site or to wear a necklace with the victim's picture affixed inside. I agree with the State's contention that accountability is one of the goals of the juvenile justice system; however, it also is a goal of the juvenile justice system to "meet the needs of the juvenile" in providing an appropriate plan for rehabilitating the juvenile. N.C. Gen.Stat. § 7B-2500(2005). "[T]he record must show that the condition is fair and reasonable, related to the needs of the child, and calculated to promote the best interest of the juvenile in conformity with the avowed policy of the State in its relation with juveniles." In re Schrimpsher, 143 N.C.App. at 468, 546 S.E.2d at 412 (citation omitted). See also In re Robinson, 151 N.C.App. 733, 736-37, 567 S.E.2d 227, 229 (2002).
Absent an abuse of discretion on the part of the trial court, its ruling may not be disturbed on appeal. In re Robinson, 151 N.C.App. 733, 737, 567 S.E.2d 227, 229 (2002). "`"An abuse of discretion occurs when the trial court's ruling `is so arbitrary that it could not have been the result of a reasoned decision.'"'" In re Robinson, 151 N.C.App. at 738, 567 S.E.2d at 229 (quoting Chicora Country Club, Inc. v. Town of Erwin, 128 N.C.App. 101, 109, 493 S.E.2d 797, 802 (1997), disc. rev. denied, 347 N.C. 670, 500 S.E.2d 84 (1998))(quoting White v. White, 312 N.C. 770, 777, 324 S.E.2d 829, 833 (1985)). It is also well settled that "[t]he dispositional order shall be in writing and shall contain appropriate findings of fact and conclusions of law." N.C. Gen.Stat. § 7B-2512. See also In re Ferrell, 162 N.C.App. 175, 177, 589 S.E.2d 894, 895 (2004).
Here, "the findings of fact in the dispositional order do not support the trial court's decision" to require J.B. to visit the victim's grave site. The evidence further fails to support the court's finding that wearing a necklace with the victim's picture affixed inside would be in J.B.'s best interests. It is, therefore, my opinion that the juvenile court abused its discretion. The record indicates that J.B. (1) was in grief counseling and is continuing to grieve; (2) was the victim's cousin and likely sees the victim's family frequently; (3) has an 82 IQ with a below average functional range; (4) has age-equivalents ranging from 7 years, 2 months, to 13 years, 6 months with an average of 10 years, 8 months; (5) probably will need continued involvement in therapy based on J.B.'s adjustment and the potential of his becoming a risk to himself  rather than to others; (6) has difficulty in comprehension, especially in complex social interactions; (7) is in the clinical range on Hyperactivity, Conduct Problems, Depression, and Withdrawal and is in the borderline range for Anxiety; and (8) has Attention-Deficit/Hyperactivity Disorder and had difficulty in school beginning around the fifth or sixth grade.
In determining J.B.'s conditions for probation, the juvenile court explained to him the seriousness of his actions and the importance of taking responsibility for those actions.
Court: I've heard ad nauseam about what you've gone through. But what you've gone through compares nothing to what the [victim's] family has gone through. Do you understand that?
Juvenile: Yes, sir.
Court: And what they've gone through is because of your actions and your actions alone. . . . And because of your stupidity  which is what is was  plainly stupidity  [the victim] is not going to graduate from high school, he ain't going to no prom, he ain't going to get married, ain't going to have no children. None of those things. Because of your stupidity. . . . Do you understand that?
Juvenile: Yes, sir.
Court: And I hope you appreciate  truly appreciate what you've done. You call it an accident. I don't. That ain't no accident. . . . And just so you'll know where I'm coming from, the fact that you shot your cousin, then ran away, and then returned to retrieve property so you wouldn't be implicated and did nothing to notify  that's just cold-hearted. That is just absolutely cold-hearted. And I think you forfeit any right to participate in any high school functions because of that behavior. [The victim] has given it up for the rest of his life. He doesn't *391 get to do any of that. So, I think for two years, it wouldn't hurt you at all."
While it was within the juvenile court's authority to consider J.B.'s accountability or lack thereof, the juvenile court also was required to consider all of his individual needs when "fashioning alternatives" for the conditions of probation. The juvenile court focused on J.B.'s "crime" to the exclusion of his needs; however, both necessarily must be considered pursuant to the requirements of the North Carolina General Statutes. N.C. Gen.Stat. § 7B-2501.
The juvenile court tended to ignore the undisputed evidence directly related to J.B.'s needs in designing a plan to fit this juvenile's best interests, although the judge explicitly acknowledges such evidence exists:
Court: I think both parties are correct in that I've got to consider the protection of the public and the needs of the juvenile considering all these factors to transfer it. And so I will find that . . . the juvenile falls in the below average range as far as his intellectual functioning. That the evidence that I heard is that he thinks as someone who is two to three years younger than his actual physical age. I didn't hear any direct evidence concerning the maturity of the juvenile. . . . He has no prior record. . . . Been no prior attempts to rehabilitate the juvenile.
After considering the seriousness of the crime, the juvenile court found that out of "all the evidence . . . [J.B.'s] not a danger to society or is not a danger to the public." The juvenile court further stated in direct contradiction of its statements noted supra:
Court:  I've heard all this  I don't consider [the juvenile] slow. I mean I've heard what you said about his intellectual  you know, but that has not crossed my mind. What he did afterwards  after this happened doesn't indicate he's intellectually slow.
The record was clear, however, that J.B.'s IQ was below average functional range and J.B. has had difficulty in school beginning around the fifth or sixth grade. Doctor Heather Scheffler ("Dr. Scheffler"), a clinical psychologist with an emphasis in pediatrics and with experience in conducting assessments, consulting with school systems regarding children with needs, and providing therapy for childhood and adolescent disorders, such as Attention-Deficit/Hyperactivity Disorder, learning disorders, depression, and anxiety, diagnosed J.B. with Attention-Deficit/Hyperactivity Disorder in 2001, a diagnosis which was not made in anticipation of this dispositional hearing, but rather done after his parents requested a psychological evaluation to complement a planned school-based psycho-educational evaluation. Moreover, the juvenile court gave no consideration to Dr. Scheffler's findings that J.B. had problems with hyperactivity, conduct, depression, withdrawal, and anxiety nor did it give any consideration that he was in grief counseling when it determined that he must wear a necklace around his neck and visit the victim's grave site. The juvenile court should have considered all of the evidence when determining the individualized needs of J.B. and balancing those needs against the objectives of the state.
The record further indicated that the juvenile court compared J.B.'s actions to those of an adult when determining his conditions of probation.
Court: I mean what he did, if you think about it  I mean what he did, if he was an adult in a different fact situation, if we were talking  you know, he could be facing murder charges because of the fact  what he came by, took the weapon, took everything so he wouldn't be implicated and he went off . . .
Counsel: But there's other facts, Judge. I mean 
Court: Oh, I know that. That's what I'm saying.
"Disposition of a juvenile, however, involves a philosophy far different from adult sentencing. . . . [A] delinquent child is not a `criminal.' The inference is that a juvenile's disposition is not intended to be a punishment but rather an attempt to rehabilitate him." In re Vinson, 298 N.C. 640, 666, 260 S.E.2d 591, 607 (1979). Therefore, it is irrelevant what the court would have done were J.B. an adult and it was inappropriate for the court to take *392 into consideration what it would have done if he were to be punished and treated as an adult.
Based on the record before the court containing the special individualized needs of this juvenile, and for the reasons stated above, I would find the court erred in requiring J.B. to visit the victim's grave site and to wear a necklace with the victim's picture affixed inside.
Accordingly, I must dissent from the majority's opinion.