IN THE MATTER OF: C.F.S., J.D.S.
No. COA09-47.
Court of Appeals of North Carolina.
Filed June 2, 2009
This case not for publication
Twanda M. Staley, for Forsyth County Department of Social Services, petitioner-appellee.
Womble Carlyle Sandridge & Rice, by Murray C. Greason, III, for Guardian ad Litem.
Rebekah W. Davis, for respondent-appellant mother.
JACKSON, Judge.
Respondent-mother ("respondent") appeals from an order terminating her parental rights to C.F.S. and J.D.S. (collectively "the juveniles"). For the reasons stated below, we affirm.
The Forsyth County Department of Social Services ("DSS") has been involved with respondent's family since 2001, when DSS received a report that C.F.S. was a neglected juvenile. DSS was granted custody of C.F.S., as well as two of her siblings, by non-secure custody order. In November 2002, C.F.S. and her siblings were adjudicated neglected and dependent juveniles. In March 2004, physical and legal custody of C.F.S. was returned to respondent.
On or about 20 March 2007, DSS received a report that C.F.S., as well as her younger sibling J.D.S., were being neglected. DSS stated that there were allegations that respondent was abusing prescription and illegal drugs. A social worker investigated the report, but did not find evidence of illegal drug use. Moreover, the social worker did not find any "safety factors which would indicate that [respondent] was abusing substances that would put her children at risk."
On 6 May 2007, DSS received another report regarding respondent. The report alleged that C.F.S. and J.D.S. were neglected and dependent because they resided in an environment injurious to their welfare. Specifically, it alleged that due to an earache, respondent had taken "everything she could `get her hands on'"  Neurontin, Valium, and Vicodin  "in order to dull the pain." She then attempted to take herself to the hospital but fell asleep while driving and hit a tree. J.D.S. was with her in the car. Respondent was taken to the hospital, where she tested positive for cocaine and benzodiazepines. On 7 May 2007, DSS filed petitions alleging that C.F.S. and J.D.S. were neglected and dependent juveniles. DSS assumed custody of the children by non-secure custody order.
An adjudicatory hearing was held on 31 August 2007. The trial court adjudicated C.F.S. and J.D.S. to be neglected and dependent juveniles and granted legal custody of the juveniles to DSS. The trial court ordered that respondent: (1) submit to urinalysis testing; (2) participate with DayMark Recovery and Dual Diagnosis treatment and follow up on all recommendations; (3) participate in parenting classes through Imprints and demonstrate parenting skills during visitation with the juveniles; (4) obtain a parenting capacity assessment and follow up on all recommendations; and (5) find employment and maintain suitable housing.
A permanency planning review hearing was held on 10 October 2007. Respondent was visiting with the juveniles and displaying appropriate behavior, and otherwise complying with the trial court's adjudicatory order.
Another permanency planning review hearing was held on 4 January 2008. Respondent had missed two scheduled visits with the juveniles. Additionally, she was offered an extension of her scheduled visitation, and DSS attempted to accommodate her. However, respondent advised DSS that the proposal would not work with her schedule because it was "too much." DSS made another attempt to accommodate respondent, but when DSS called to schedule additional visitation, respondent stated that she was sick. In December 2007, respondent missed a regularly scheduled visit and stated to the social worker "that she had not changed clothes all week because she has no where to live."
With respect to her drug treatment, she was no longer attending treatment at DayMark because she had begun treatment at The Rehobeth House. However, she was dismissed from The Rehobeth House for being confrontational and defiant with the staff. Her case manager had arranged for her to live at Hosanna House, but she had been released from the house and program because "she was irate, defiant, demanding as if she was running the program and not willing to receive help." She refused to participate in the program and would not accept responsibility for her situation. Her case manager was attempting to get respondent into Black Mountain Recovery, but stated that this would be the final effort on respondent's behalf; if she was not accepted, her case would be closed because she would have exhausted the services the facility could provide for her and she had not made progress toward "accepting she has a problem and dealing with it."
Respondent missed several appointments with respect to her court-ordered parenting capacity assessment and psychological evaluation. When she finally met with the doctor, she left early. Respondent "seemed drowsy and was closing her eyes quite a bit." She "complained of being in pain and asked if they could finish early." The doctor did not complete the testing "because her behavior would affect the outcome." He felt that respondent "has addiction issues and does not seem to be working towards recovery," and that she "is in denial about her situation." He did not feel that "she is near stable enough to parent her children anytime soon." Further, respondent had tested positive for cocaine; had failed to establish stable housing; and failed to complete parenting classes at Imprints. Accordingly, the trial court relieved DSS of reunification efforts with respondent and changed the permanent plan for the juveniles to adoption. On 5 March 2008, DSS filed a petition to terminate respondent's parental rights. DSS alleged three grounds for termination: (1) that respondent had neglected the juveniles within the meaning of North Carolina General Statutes, section 7B-101(15), pursuant to section 7B-1111(a)(1); (2) that the juveniles had been placed in the custody of DSS, and respondent, for a continuous period of six months immediately preceding the filing of the petition, had willfully failed to pay a reasonable portion of the cost of care for the juveniles although physically and financially able to do so, pursuant to section 7B-1111(a)(3); and (3) that respondent had abandoned the juveniles for at least six consecutive months immediately preceding the filing of the petition, pursuant to section 7B-1111(a)(7).
On 28 July, 1 August, and 18 August 2008, the trial court held a hearing on the petition to terminate respondents' parental rights. The trial court concluded that grounds existed pursuant to North Carolina General Statutes, section 7B-1111(a)(1) to terminate respondent's parental rights. The court further concluded that it was in the juveniles' best interests that her parental rights be terminated. Accordingly, her parental rights to the juveniles were terminated. Respondent appeals.
Respondent first argues that the trial court erred by finding that grounds existed to terminate her parental rights. She contends that the trial court's findings of fact are not supported by competent evidence in the record. We disagree.
Proceedings to terminate parental rights occur in two phases:(1) the adjudication phase, and (2) the disposition phase. In re Baker, 158 N.C. App. 491, 493, 581 S.E.2d 144, 146 (2003). During the adjudication phase, the trial court determines whether grounds exist pursuant to North Carolina General Statutes, section 7B-1111 to terminate parental rights. Id. A finding of any one of the separately enumerated grounds is sufficient to support a termination. In re Taylor, 97 N.C. App. 57, 64, 387 S.E.2d 230, 233-34 (1990). "The standard of appellate review is whether the trial court's findings of fact are supported by clear, cogent, and convincing evidence and whether the findings of fact support the conclusions of law." In re D.J.D., D.M.D., S.J.D., J.M.D., 171 N.C. App. 230, 238, 615 S.E.2d 26, 32 (2005) (citing In re Huff, 140 N.C. App. 288, 291, 536 S.E.2d 838, 840 (2000), disc. rev. denied, 353 N.C. 374, 547 S.E.2d 9 (2001)). During the disposition phase, the trial court must determine whether termination of parental rights is in the best interests of the child. In re Blackburn, 142 N.C. App. 607, 612-13, 543 S.E.2d 906, 910 (2001).
Here, the trial court concluded that C.F.S. and J.D.S. were neglected juveniles. A "neglected juvenile" is defined by section 7B-101(15) as:
[a] juvenile who does not receive proper care, supervision, or discipline from the juvenile's parent, guardian, custodian, or caretaker; or who has been abandoned; or who is not provided necessary medical care; or who is not provided necessary remedial care; or who lives in an environment injurious to the juvenile's welfare; or who has been placed for care or adoption in violation of law.
N.C. Gen. Stat. § 7B-101(15) (2007). The trial court based its conclusion that respondent neglected the juveniles upon the following extensive findings of fact:
16. The juveniles were adjudicated neglected and dependent on August 31, 2007.
17. At the adjudication hearing, [respondent] was ordered to do the following if she wished to be reunited with her children: Supervised visitation; DayMark Recovery and Dual Diagnosis and follow all recommendations; parenting classes through Imprints; parenting capacity assessment and follow all recommendations; and find employment in order to maintain suitable housing.
18. [Respondent] has not obtained employment. She has physical and mental health problems. She applied for disability but was denied benefits while her children have been in DSS custody. The last job [respondent] had was in food services in 2004 and the longest she has held a job is six (6) months. [Respondent] did not maintain suitable housing. [Respondent] admitted that she is currently homeless and has no where for her children to live. She would like for the children to come live with her at Cascades after six (6) months of treatment and when she is eligible for them to go there. At the time of the TPR hearing [respondent] had not enrolled in the Cascades treatment program.
19. [Respondent] made thirty-one (31) visits or approximately sixty percent (60%) [] with the juveniles. . . .
20. [Respondent] attended but did not complete the parenting classes at Imprints.
21. [Respondent] did partially complete the parenting capacity assessment but she did not follow the recommendations that included substance abuse treatment. Dr. Bennett testified that [respondent's] untreated mental health and substance abuse problems compromised her ability to parent. DSS did not inform Dr. Bennett that [respondent] had been diagnosed with bi-polar mental illness and post traumatic stress disorder (PTSD). This information was critical to assessing her psychological needs and her ability to parent her children. Dr. Bennett would have recommended mental health treatment for her if he had known of her mental illness diagnosis.
22. [Respondent] has a dual diagnosis of mental illness, bi-polar and PTSD, and substance abuse. She had difficulty getting her mental health medications because she could not pay co-payments for prescriptions. She attempted to get psychiatric medications through community resources. DSS did not agree to pay an up-front fee of $60.00-$100.00 to allow [respondent] to receive free psychiatric medicines for one year through a program her psychiatrist at DayMark found.
23. Efforts toward assisting [respondent] focused on her substance abuse diagnosis.
24. [Respondent] has not completed a drug treatment program. [Respondent] has made at least nine unsuccessful attempts at drug treatment. The programs she attempted or was referred to include ARCA, Salvation Army, Prodigals, DayMark, WISH, Rehobeth House, Cascades, and Hossanna [sic] House. She was taken to TROSA but denied treatment there due to her medical problems.
25. [Respondent] testified that she needs long-term drug and mental health treatment. She admitted that she still uses alcohol and drugs. She testified that the longest she had been clean was 2 1/2 years and that was during the previous time her children were in DSS custody. [Respondent] previously had children in DSS custody in 2002.
26. [Respondent] admitted that her children have been in DSS custody before for the same issues that brought them into care this time. . . .
27. On August 16, 2007, [respondent] entered Prodigals as an in-patient. She was discharged from the program on August 20, 2007, for being uncooperative and failing to do work assigned. Also on August 20, 2007, [respondent] was taken from Prodigals by ambulance to the hospital for an anxiety-panic attack.
28. [Respondent] was discharged from the Salvation Army Shelter on November 2, 2007, after receiving thirty-four (34) violations.
29. In December 2007, [respondent] was asked to leave Hossana House because she was difficult to work with, defiant, and she refused to participate in the treatment program.
30. [Respondent] was discharged from Day Mark [sic] in April 2008 for failure to attend her substance abuse treatment program regularly.
31. [Respondent] began participating in the WISH program in April 2008. In May 2008, [respondent] was discharged from WISH for failure to cooperate with the treatment plan which included a referral to Cascades, a residential drug treatment program. On April 22, 2008, [respondent] tested positive for cocaine. The test was administered by WISH personnel.
32. WISH identified Cascades as an appropriate program for [respondent]. Cascades is a residential drug treatment program that allows parents to bring their children. Cascades also would address [respondent's] mental health issues. There have been attempts for [respondent] to go there but she has not gotten there yet
33. [Respondent's] mental health issues have not been dealt with as they should. In-home services were not put in place but that may have been due, in part, to [respondent's] periods of homelessness.
. . .
36. [Respondent] neglected the juveniles pursuant to 7B-1111(a)(1) in that she failed to address the issues that brought her children into DSS custody. She has not made meaningful progress in eliminating the conditions that led to removal of her children. Also, the juveniles were adjudicated neglected on August 31, 2007. This is the second time [respondent] has had children in DSS custody due to her drugissues. It is very likely that such neglect will continue.
The trial court further found as fact:
37. It is [in] the children's best interest to terminate [respondent's] parental rights. [Respondent] has failed to show that she can provide permanence for them at this time and they do not have time to wait for her to address her mental health and drug issues. It is in the children's best interest to terminate [respondent's] parental rights and find a home for them. These children need permanence.
. . .
39. [J.D.S.] is four (4) years old. He was three (3) when he came into DSS custody. He was not toilet trained when he came into DSS custody and could speak only a few words. He has thrived while in foster care. He is now toilet trained, his vocabulary is developing, he knows his colors, and can count to seventeen (17). [C.F.S.] was seven (7) when she came into DSS custody. She is now eight (8). She attends Konnoak School and the teachers have noticed marked changes in her appearance and performance in school. The juveniles have improved greatly since coming into DSS custody. The children are thriving.
Respondent assigns error to findings of fact numbers 24, 25, 27, 36, 37, and 39. "If unchallenged on appeal, findings of fact `are deemed supported by competent evidence' and are binding upon this Court." In re J.M.W., E.S.J.W., 179 N.C. App. 788, 792, 635 S.E.2d 916, 919 (2006) (quoting In re Padgett, 156 N.C. App. 644, 648, 577 S.E.2d 337, 340 (2003)). Therefore, the remaining findings of fact are deemed supported by competent evidence and are considered binding.
With respect to finding of fact number 24, respondent contends that she has not completed drug treatment because she was not offered mental health services. She further contends that finding of fact number 27  that she was discharged from Prodigals "for being uncooperative and failing to do work assigned"  is deficient for similar reasons. Respondent claims that because her mental health issues were not addressed, any type of drug treatment was compromised. Therefore, respondent asserts that the evidence does not support a finding that her failure to complete drug treatment was willful. We disagree.
There is substantial evidence in the record to support the trial court's finding that respondent did not complete any drug treatment program. Moreover, Dr. Burt Lester Bennett, III ("Dr. Bennett"), the doctor assigned to complete the parenting capacity and psychological evaluation, was specifically asked during the termination hearing whether respondent's "failure to keep her appointments" could have resulted "from inadequately treated bipolar or post traumatic stress disorder mental illness?" Dr. Bennett conceded that "[i]t could, but in my opinion it was more likely the addiction." The record does not contain evidence that treatment of respondent's mental illness would have allowed treatment of her substance abuse issues to be successful. To the extent that different inferences may be made from the evidence, that was for the trial court's determination. See In re Whisnant, 71 N.C. App. 439, 441, 322 S.E.2d 434, 435 (1984) (It is the trial judge's duty to "weigh and consider all competent evidence, and pass upon the credibility of the witnesses, the weight to be given their testimony and the reasonable inferences to be drawn therefrom."). Therefore, we conclude there was sufficient evidence to support findings of fact numbers 24 and 27.
Respondent contends that finding of fact number 25, that she testified that she needs long-term drug and mental health treatment, is not a finding of fact but a recitation of evidence. We disagree.
Respondent denied that she needed to be in a two-year "structured treatment" program, but admitted that she needed to be in a long-term treatment program. The trial court reconciled this testimony in finding of fact number 25. We conclude the trial court's finding of fact was proper.
Respondent contends that findings of fact numbers 36 and 37 are not findings of fact but conclusions of law. Therefore, she does not argue in her brief that they are not supported by competent evidence. " Questions raised by assignments of error in appeals from trial tribunals but not then presented and discussed in a party's brief, are deemed abandoned." N.C. R. App. P. 28(a) (2007). Accordingly, to the extent that these contain findings of fact, they are deemed supported by competent evidence because respondent has abandoned any contention otherwise.
As to finding of fact number 39, respondent contends that the evidence does not show that the juveniles were "uncared for" when they entered foster care or that they were "thriving" in foster care. Respondent also reiterates that the trial court should have considered the failure to treat her mental illness, because the failure to treat her mental illness resulted in the failure of her drug treatment plan. However, finding of fact number 39 does not assert that the juveniles were "uncared for" prior to entering foster care. This finding of fact merely shows the state of the juveniles' development upon entering DSS custody and the state of their development at the time of the termination hearing. There is competent evidence in the record to support the assertions made in finding of fact number 39.
The children were placed in foster care due to respondent's neglect. The juveniles' foster mother testified that when she first received the juveniles into her care they were "a little disheveled, unkempt, and they didn't have many clothes with them." She further testified that, initially, C.F.S. had behavioral issues. By the time of the hearing, however, C.F.S.'s appearance had changed; she was healthy; and she was reading above her grade level. Further, J.D.S. was not "potty trained" when he entered her care, but by the time of the hearing he had been fully potty trained for five months. Moreover, J.D.S.'s vocabulary had increased; he was "fluent with approximately six (6) to seven (7) colors" and could count up to "maybe seventeen." Based upon this evidence, we conclude that the trial court could properly find that the juveniles were thriving in foster care.
It is apparent from the trial court's findings of fact that respondent failed to adequately address her substance abuse issues, did not complete her parenting classes or the parenting capacity assessment, and did not obtain employment or maintain suitable housing. While the trial court may have found that respondent's mental health issues were not properly treated, it implicitly found that this did not excuse her failure to address her other substantial issues. Therefore, based upon the clear, cogent, and convincing evidence in the record and accordant findings of fact, the trial court was free to conclude that respondent neglected C.F.S. and J.D.S., and that the neglect was likely to continue should the children be returned to respondent's care. Accordingly, we hold that sufficient grounds existed for termination of respondent's parental rights pursuant to North Carolina General Statutes, section 7B-1111(a)(1).
Finally, respondent argues that the trial court erred in concluding that it was in the best interests of the juveniles to terminate respondents' parental rights. We disagree.
"The trial court has discretion, if it finds that at least one of the statutory grounds exists, to terminate parental rights upon a finding that it would be in the [juveniles'] best interests." In re Nesbitt, 147 N.C. App. 349, 352, 555 S.E.2d 659, 662 (2001) (citations omitted). Factors to consider in determining the juveniles' best interests include: (1) the age of the juveniles; (2) the likelihood of adoption; (3) the impact on the accomplishment of the permanent plan; (4) the bond between the juveniles and the parent; (5) the relationship between the juveniles and a proposed adoptive parent or other permanent placement; and (6) any other relevant consideration. N.C. Gen. Stat. § 7B-1110(a) (2007). The court is to take action "which is in the best interests of the juvenile" when "the interests of the juvenile and those of the juvenile's parents or other persons are in conflict." N.C. Gen. Stat. § 7B-1100(3) (2007). As a discretionary decision, the trial court's disposition order will not be disturbed unless " it could not have been the result of a reasoned decision." In re J.B., 172 N.C. App. 747, 751, 616 S.E.2d 385, 387 (citation omitted), aff'd, 360 N.C. 165, 622 S.E.2d 495 (2005) (per curiam).
Here, the trial court's detailed findings of fact reveal that the trial court considered the factors required by section 7B-1110(a). The juveniles were four and eight years old. See N.C. Gen. Stat. § 7B-1110(a)(1) (2007). "Through church, the foster parent has identified a family that would like to adopt [the juveniles]." See N.C. Gen. Stat. § 7B-1110(a)(2) (2007). The juveniles "do not have time to wait for [respondent] to address her mental health and drug issues. . . . These children need permanence." See N.C. Gen. Stat. § 7B-1110(a)(3) (2007). "There is no doubt the juveniles love their mother. [Respondent] testified that she does not want her children to think she does not love them or not know where she is. She also testified that she wants the best for her children." See N.C. Gen. Stat. § 7B-1110(a)(4) (2007). "The children currently receive respite care from the prospective adoptive parents. The foster parent testified that the children enjoy spending time with the prospective adoptive parents." See N.C. Gen. Stat. § 7B-1110(a)(5) (2007).
Based upon these, and other, findings of fact, made after an extensive termination hearing, we can discern no abuse of discretion in the trial court's determination that it was in the juveniles' best interests to terminate respondent's parental rights. Accordingly, we affirm.
Affirmed.
Judges STEPHENS and STROUD concur.
Report per Rule 30(e).