IN THE MATTER OF: B.M.J., Juvenile.
No. COA09-726
Court of Appeals of North Carolina
Filed October 20, 2009
This case not for publication
Assistant County Attorney Susan L. Fosmire, for Henderson County Department of Social Services petitioner-appellee.
Carol Ann Bauer for respondent-mother appellant.
ROBERT N. HUNTER, JR., Judge.
Respondent-mother appeals from an order terminating her parental rights to B.M.J. We affirm.

I. Factual Background
Respondent-mother, B.M.J., and her husband, B.M.J.'s father, resided in a three-bedroom trailer in Henderson County, North Carolina. B.M.J. is a ten-year-old child with an IQ in the 50s who has been diagnosed with severe expressive language disorder, bipolar disorder, ADHD, and pervasive developmental disorder. On 19 January 2007, respondent-mother's husband passed away. After the death of her husband, respondent-mother developed anxiety and became depressed, whereupon she began to visit a medical health professional to receive treatment. Moreover, respondent's husband left a piece of property to his nineteen-year-old son, respondent's stepson. Respondent-mother's stepson sold the property which was left to him by his father and cut off the water to the PVC valves in the power line to the well. As a result of the stepson's actions, respondent-mother and B.M.J. did not have running water in their trailer and were forced to bring in 30 gallons of water a day to wash dishes, cook, clean up and complete their daily tasks.
On 14 June 2007, shortly after the death of respondent's husband, the Henderson County Department of Social Services ("DSS") filed a petition alleging that B.M.J. was a neglected juvenile. DSS stated that it had received reports that respondent-mother had slapped the juvenile in the face, was verbally abusive to the juvenile, and that the juvenile was not properly cared for and was often left unsupervised. A non-secure custody order was entered and B.M.J. was placed in the custody of DSS. However, on 11 July 2007, the district court entered an order dismissing the petition on the basis that neglect had not been proven by clear and convincing evidence.
DSS filed a second petition alleging neglect on 31 October 2007. DSS stated that on 22 August 2007, a social worker visited respondent-mother's home and found it "dirty and unkempt." DSS reported that there were dirty, mold-covered dishes in the sink, and there was no running water in the home. Then, on 24 August 2007, DSS investigated a report that the juvenile was not being properly supervised by respondent-mother. During this period of time when the juvenile was unsupervised, the juvenile "spray painted the outside of the neighbor's home and played in diesel fuel." DSS alleged that the juvenile suffered from behavioral problems and was not being given his medication. DSS further alleged that the respondent-mother had admitted to neighbors that she could not manage the juvenile or afford his medication.
DSS stated that it received another report from a neighbor on 6 September 2007 that the juvenile was again being left unsupervised. The neighbor further reported that the juvenile had defecated on himself and was found wearing only a t-shirt. Moreover, the neighbor reported that the juvenile attempted to awaken the respondent-mother for help in cleaning himself, but was unable to arouse her. Then, on 22 September 2007, DSS and law enforcement responded to a report that a child was found in the middle of a highway. It was reported that the juvenile told the owner of a nearby home that he did not want to return home. About an hour later, the respondent-mother called police to report the juvenile missing. The juvenile was returned home and the social worker discussed with respondent-mother her need to properly supervise the juvenile. The respondent-mother stated to the social worker that she only had a few beans to eat, and there was no money to buy food. The respondent-mother additionally told the social worker that her car was "in the shop" and there was no money to pay for the repairs or other transportation. The social worker took photographs of the home, which showed "trash bags and trash strewn all about, with animal feces all over the floor." Additionally, the commodes were full of human waste, and there was no running water to flush the toilets.
Finally, just prior to the filing of the petition, DSS alleged that on 29 October 2007, respondent-mother and the juvenile went to a domestic violence shelter in Hendersonville at 3:00 a.m. "wearing filthy clothing that smelled foul. The mother was wearing only a t-shirt and underwear, and was wrapped in a blanket." The respondent-mother reported that her home was without water or electricity and was "freezing." The mother subsequently became ill and was taken to the hospital. A social worker later met with respondent-mother and the juvenile at their home. The social worker found that there was no electricity or running water in the home. Additionally, the home "had animal feces on the carpet, there were three tubs [] full of dirty dishes on the floor, and old molded food on the countertop and stove." The juvenile was reportedly wearing only shorts, although it was "quite cold." When this was pointed out to the respondent-mother, she stated that the reason the juvenile was wearing shorts was because he had "no clean clothes, as the mother had not done laundry." DSS conferred with the juvenile's school and learned that the juvenile had arrived at school wearing his Spiderman Halloween costume for four straight days. On 30 October 2007, the school documented that the buttocks of the costume was stained with feces, and the juvenile was not wearing any underwear.
DSS alleged in the petition that respondent-mother had "consistently failed to provide for her family, including the juvenile, with food and other basic necessities." DSS recounted multiple attempts at providing the family with food, but alleged that respondent-mother nonetheless continued to be unable to provide basic nutrition for the family. For instance, during the month of August DSS, Interfaith Ministries, and Anchor Baptist ministries attempted to supply respondent-mother's family with food on three separate occasions. DSS further recounted respondent-mother's failure to pay bills, her financial mismanagement, and her failure to maintain a sanitary home. Accordingly, a non-secure custody order was entered and B.M.J. was placed in the custody of DSS.

II. Procedural History
On 3 January 2008, nunc pro tunc 20 December 2007, the district court adjudicated B.M.J. a neglected juvenile. At disposition, the court continued custody with DSS and ordered DSS to make reasonable attempts at reunification. To achieve reunification, the court ordered that the respondent-mother comply with the following requirements:
a. The mother will secure safe, stable housing that has running water, heat, and electricity. The mother will ensure the home has adequate food to meet the needs of the juvenile. The mother will also keep the residence clean, organized and free of clutter, debris, trash and animal feces.
b. The mother will work with the juvenile's one on one worker to learn new ways to handle the juvenile's behavioral issues and increase her knowledge of parenting skills.
In addition to the above when the juvenile is in the care of the mother, the mother will supervise the child appropriately and adequately given the child's developmental delay and behavioral needs.
c. The mother will continue to maintain her mental health appointments through Family Preservation. The mother will follow any and all recommendations provided by the staff at Family Preservation including taking prescribed medications correctly.
d. The mother will address her own physical health concerns by attending regular doctor's appointments to ensure she is physically capable of caring for the juvenile.
The trial court held a review hearing on 20 March 2008. The court found as a fact that respondent-mother had not completed the requirements it had set out in order to achieve reunification, but had made progress. The court found that:
The following requirements on the mother are as yet unfilled: Mother needs to learn appropriate parenting skills to help the juvenile with his behavior. The mother must be able to constantly supervise the juvenile. Mother needs to continue to work with the mental health case manager to develop a behavioral plan for the juvenile.
The court concluded that respondent-mother's "compliance and actions [were] not sufficient to remedy the conditions which led to the juvenile's removal." Accordingly, the court continued custody with DSS and the plan of reunification.
Another review hearing was held on 26 June 2008. The trial court found that since its previous hearing, respondent-mother had not completed the court's requirements that were prerequisites to reunification. The court stated that the following requirements were as yet unfulfilled:
a. Mother has been evicted from her house due to non-payment of rent. Mother was staying at the Mission but was asked to leave because she refused to accept assistance with budgeting and money management. Mother is currently residing at Hendersonville Nursing Home, which doesn't allow children to reside there.
b. Mother has not demonstrated the ability or the willingness to develop the parenting skills necessary to meet the special needs of this juvenile.
c. Mother has failed to complete the psychological testing as recommended by Family Preservation.
The court again continued custody with DSS and did not change the permanent plan of reunification. As a condition of reunification, the court reiterated the requirements previously placed on respondent-mother, and added the following requirements:
a. Mother will utilize and participate with community resources to assist her in understanding and managing this juvenile's special needs. Mother will demonstrate benefits from the use of these resources as evidenced by her increase[d] ability to manage the juvenile's behavior and to assist the juvenile in improving his skill levels and ability to function.
b. Mother will utilize and participate with community resources designed to assist her in managing her financial resources. Mother must apply money to the juvenile's benefit and not her own.
On 20 November 2008, the trial court held another review hearing and again found that respondent-mother had not completed the court's requirements that were conditions precedent to reunification. The court found that reunification within six months was unlikely and that a plan of adoption should be pursued. Accordingly, the trial court continued custody with DSS and sanctioned a permanent plan of termination of respondent-mother's parental rights.
On 27 January 2009, DSS filed a motion in the cause to terminate respondent-mother's parental rights. DSS alleged two grounds for termination: (1) that respondent-mother had neglected the juvenile within the meaning of N.C. Gen. Stat. § 7B-101(15) and pursuant to N.C. Gen. Stat. § 7B-1111(a)(1); and (2) that respondent-mother had willfully left the juvenile in foster care for more than twelve months without showing that reasonable progress under the circumstances had been made in correcting those conditions that led to the child's removal, pursuant to section 7B-1111(a)(2).
A hearing was held on the motion to terminate respondent-mother's parental rights on 19 March 2009. The trial court concluded that grounds existed pursuant to N.C. Gen. Stat. § 7B-1111(a)(1) and (2) to terminate respondent-mother's parental rights. The court further concluded that it was in the juvenile's best interests that respondent-mother's parental rights be terminated. Accordingly, on 27 March 2009, nunc pro tunc 19 March 2009, the trial court terminated respondent-mother's parental rights. Respondent-mother appeals.

III. Issues on Appeal

A. Sufficiency of Grounds for Termination of Respondent-mother's Parental Rights
Respondent-mother first argues that the trial court erred by concluding that grounds existed pursuant to N.C. Gen. Stat. § 7B-1111 to terminate her parental rights.
N.C. Gen. Stat. § 7B-1111 sets out the statutory grounds for terminating parental rights. A finding of any one of the separately enumerated grounds is sufficient to support a termination. In re Taylor, 97 N.C. App. 57, 64, 387 S.E.2d 230, 233-34 (1990). "The standard of appellate review is whether the trial court's findings of fact are supported by clear, cogent, and convincing evidence and whether the findings of fact support the conclusions of law." In re D.J.D., 171 N.C. App. 230, 238, 615 S.E.2d 26, 32 (2005) (citing In re Huff, 140 N.C. App. 288, 291, 536 S.E.2d 838, 840 (2000), disc. review denied, appeal dismissed, 353 N.C. 374, 547 S.E.2d 9 (2001)).
In the case sub judice, the trial court concluded that grounds existed pursuant to N.C. Gen. Stat. § 7B-1111(a)(2) to terminate respondent-mother's parental rights. This Court has stated that:
[T]o find grounds to terminate a parent's rights under G.S. § 7B-1111(a)(2), the trial court must perform a two part analysis. The trial court must determine by clear, cogent and convincing evidence that a child has been willfully left by the parent in foster care or placement outside the home for over twelve months, and, further, that as of the time of the hearing, as demonstrated by clear, cogent and convincing evidence, the parent has not made reasonable progress under the circumstances to correct the conditions which led to the removal of the child.
In re O.C., 171 N.C. App. 457, 464-65, 615 S.E.2d 391, 396 (citation omitted), disc. review denied, 360 N.C. 64, 623 S.E.2d 587 (2005).
Here, in support of its conclusion of law that grounds existed pursuant to N.C. Gen. Stat. § 7B-1111(a)(2) to terminate respondent-mother's parental rights, the trial court made multiple findings regarding her failure to complete the requirements ordered by the court to achieve reunification. The trial court found:
11. Since December 2007 the mother has failed to secure safe and stable housing. She has established a pattern of failing to pay rent, failing to maintain electricity, failing to keep the homes free from clutter and trash.
12. On June 15[,] 2008 Mother was evicted from her home due to non-payment of rent. The home was littered with dog feces and trash. Upon the mother's eviction the landlord had to replace the carpet due to the dog feces. The landlord also had to rent a dumpster to haul out the trash that the mother left behind. The mother also left behind a washer/dryer and big screen TV as well as two oxygen tanks. The landlord called the rental agencies to pick up these items.
13. On August 31, 2008 Mother was evicted from Dogwood Retirement Center for non-payment of rent.
14. The mother stayed at the Rescue Mission October 30, 2007 until November 8, 2007; May 27, 2008 until June 3, 2008 and September 5, 2008 until September 15, 2008. The mother was evicted from the Mission for non-compliance. The mother was argumentative with the staff and the juvenile. When the Mission attempted to counsel her on how to manage her finances she told the Executive Director to shut up. She refused to take a bath when requested. . . . The mother has been permanently banned from the Rescue Mission.
15. On September 25, 2008 Mother moved to the Mainstay Shelter. Mother was evicted due to non-compliance, to wit: She was arrested on 14 October 2008 for shoplifting, she refused to participate in group meetings, she refused to get up on time and an empty bottle of Ambien was found next to her bed.
16. On or about November 4, 2008 the mother rented a house. The home had no electricity until November 15, 2008 when a church paid the mother's past due electric bill of $300.00. The mother was evicted January 2009 for non-payment of rent. Upon her eviction the landlord found the refrigerator broken, the sink not draining and a hole in the wood floor. The landlord hauled 3-4 bags of trash from the home. The landlord also had to call the rental company to pick up a washer/dryer and stove that the mother had rented and failed to return.
17. The mother lived out of her car for a period of two weeks.
. . . .
19. [DSS] attempted to become the mother's Representative Payee but the mother did not bring in the necessary documentation in a timely manner. Further, it was unclear if [DSS] could be her Representative Payee as the mother receives not only SSI but a pension as well. The mother's income is $1,450.00 per month.
20. The mother's lack of securing safe and stable housing is not because of her financial situation as housing is within her financial means.
21. The mother failed to complete any program to address the needs of the juvenile and/or increase her parenting skills. Family Preservation has been working with the mother and this juvenile for approximately three years. Despite this length of time the mother has not demonstrated a knowledge of the skills required to be a parent to this juvenile. The juvenile has special needs, including mental retardation, mood disorder, [severe] expressive and receptive language disorder and disruptive behavior disorder.
. . . .
23. The mother did not obtain a psychological assessment.
24. The mother did obtain a substance abuse assessment which stated there were no recommendations for the mother to follow.
With the exception of finding of fact number 20, respondent-mother does not challenge the above findings made by the trial court. Therefore, those findings of fact are deemed to be supported by sufficient evidence, and are binding on appeal. N.C.R. App. P. 28(b)(6); see also In re P.M., 169 N.C. App. 423, 424, 610 S.E.2d 403, 404-05 (2005) (concluding respondent had abandoned factual assignments of error when she "failed to specifically argue in her brief that they were unsupported by evidence").
In regard to finding of fact number 20, respondent-mother argues that the finding is unsupported by the evidence. Respondent-mother claims that she had indeed secured safe and stable housing by the time of the termination hearing. In fact, the trial court recognized this evidence, finding that in February 2009, just a month prior to the termination hearing, respondent-mother rented a three-bedroom trailer. However, by respondent-mother's own admission, she had a pattern of living in a place for a couple of months, and then would be evicted for non-payment of rent. Moreover, as noted previously herein, respondent-mother does not challenge the trial court's finding that she had "established a pattern of failing to pay rent, failing to maintain electricity, failing to keep the homes free from clutter and trash." Furthermore, the evidence and the trial court's unchallenged findings of fact reveal that, subsequent to the removal of the juvenile from her home, respondent-mother was evicted from her residence on multiple occasions, whether due to non-payment of rent or non-compliance with the rules of the residence. The trial court further found that respondent-mother had a monthly income of $1,450.00. Therefore, we conclude that sufficient evidence, as well as the trial court's unchallenged findings of fact, supported a finding that respondent-mother failed to secure safe and stable housing, and that the failure was not due to her financial situation, since she had sufficient income. We further conclude that the trial court's findings of fact support its determination that respondent-mother failed to correct the conditions which led to the removal of the juvenile, and said failure was willful. See In re Nolen, 117 N.C. App. 693, 700, 453 S.E.2d 220, 224-25 (1995) ("[e]xtremely limited progress is not reasonable progress"). Accordingly, we conclude that grounds existed to terminate respondent-mother's parental rights pursuant to N.C. Gen. Stat. § 7B-1111(a)(2).
Respondent-mother additionally argues that the trial court erred by concluding that grounds existed pursuant to N.C. Gen. Stat. § 7B-1111(a)(1) to terminate her parental rights. However, because we conclude that grounds existed pursuant to N.C. Gen. Stat. § 7B-1111(a)(2) to support the trial court's order, the remaining ground found by the trial court to support termination need not be reviewed by the Court. Taylor, 97 N.C. App. at 64, 387 S.E.2d at 233-34.

B. Best Interest of the Juvenile
We next consider whether the trial court erred in concluding that it was in the best interests of the juvenile to terminate respondent-mother's parental rights. After careful review of the record, briefs and contentions of the parties, we affirm.
"The trial court has discretion, if it finds that at least one of the statutory grounds exists, to terminate parental rights upon a finding that it would be in the [juvenile's] best interests." In re Nesbitt, 147 N.C. App. 349, 352, 555 S.E.2d 659, 662 (2001) (citing In re Blackburn, 142 N.C. App. 607, 543 S.E.2d 906 (2001)). Factors to consider in determining the juvenile's best interests include: (1) the age of the juvenile; (2) the likelihood of adoption; (3) the impact on the accomplishment of the permanent plan; (4) the bond between the juvenile and the parent; (5) the relationship between the juvenile and a proposed adoptive parent or other permanent placement; and (6) any other relevant consideration. N.C. Gen. Stat. § 7B-1110(a) (2007). The court is to take action "which is in the best interests of the juvenile" when "the interests of the juvenile and those of the juvenile's parents or other persons are in conflict." N.C. Gen. Stat. § 7B-1100(3) (2007). As a discretionary decision, the trial court's disposition order will not be disturbed unless it could not have been the product of reasoning. In re J.B., 172 N.C. App. 747, 751, 616 S.E.2d 385, 387, aff'd, 360 N.C. 165, 622 S.E.2d 495 (2005).
In the instant case, the trial court's dispositional order reveals that the trial court considered the factors required by N.C. Gen. Stat. § 7B-1110(a). The trial court found:
1. The juvenile is ten years of age.
2. It is very likely that this juvenile will be adopted as the current foster family has stated that should the juvenile be cleared for adoption they would be interested in adopting him.
3. This Court has previously adopted a permanency plan for this juvenile of adoption, and termination of the parental rights as ordered herein will aid in the accomplishment of this plan.
4. There is a bond between the mother and juvenile, as there is in any parent child relationship.
5. There is a high quality of bond between the foster parents and the juvenile. The foster parents are engaged in the juvenile's therapy, assist him with his homework, and tend to his special needs. They are committed to the juvenile and give him the constant and consistent care that he needs.
Based on the findings of fact made by the trial court, we can discern no abuse of discretion. Accordingly, we affirm.
Affirmed.
Judges GEER and BEASLEY concur.
Report per Rule 30(e).